Nan M. OLDHAM, Individually and as Personal Representative of the Estate of John R. Oldham, Deceased, Appellee/Cross–Appellant

v.

KOREAN AIR LINES CO., LTD., Appellant/Cross–Appellee

Nos. 94–5321, 94–5323, 94–5324, 94–5338, 94–5371 and 94–5382.

United States Court of Appeals, District of Columbia Circuit.

Argued May 6, 1997.

Decided Sept. 23, 1997.

Rehearing Denied Nov. 6, 1997.

Andrew J. Harakas, New York City, argued the cause for appellant, with whom Deborah A. Elsasser was on the briefs. Timothy J. Lynes, Washington, DC, entered an appearance.

Juanita M. Madole, Irvine, CA, argued the cause and filed the briefs for appellees.

Before WALD and RANDOLPH, Circuit Judges, and BUCKLEY, Senior Circuit Judge.

Opinion for the court filed by Senior Judge BUCKLEY.

BUCKLEY, Senior Judge:

These consolidated cross-appeals concern pecuniary and nonpecuniary damages awarded in three separate actions brought against Korean Air Lines Co., Ltd., by the survivors and estates of four passengers killed on a flight from New York City to Seoul, Korea in 1983. As explained more fully below, we affirm in part, reverse in part, and remand for certain proceedings.

## I. BACKGROUND

### A. Proceedings in and Disposition by the District Court

On September 1, 1983, Korean Air Lines ("KAL") flight KE007 deviated from its plotted course and strayed into the airspace of the former Soviet Union. The plane crashed into the Sea of Japan after being struck by missiles fired from a Soviet military fighter plane. The crash killed all 269 persons aboard. *See generally In re Korean Air Lines Disaster of September 1, 1983,* 932 F.2d 1475, 1477–79 (D.C.Cir.1991). Multidistrict litigation proceedings established KAL's liability for this disaster. The individual cases were then separately tried for damages. In this appeal, KAL challenges damage awards in three of those trials.

In 1993, KAL filed a number of motions in the cases then awaiting trial in the United States District Court for the District of Columbia, two of which now come before us on appeal. The first motion sought to limit recoverable damages to those authorized by the Death on the High Seas Act ("DOHSA"), 46 U.S.C.App. §§ 761–768, which prohibits recovery of nonpecuniary damages. In the second, KAL opposed the plaintiffs' requests for the award of prejudgment interest and argued that in the event the court made such an award, interest should be based on the rates paid on 52–week Treasury Bills.

On April 8, 1993, the district court denied the motions. It held that DOHSA did not preclude the recovery of damages for nonpecuniary injuries because, in the court's view, damages for loss of society, survivor's grief, and pre-death pain and suffering were recoverable under Article 17 of the Warsaw Convention governing international air transportation. *See* Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, art. XVII, 49 Stat. 3000 (1934) (*reprinted in* note following 49 U.S.C. § 40105 (1994)) ("Warsaw Convention"). The court also ruled that prejudgment interest is recoverable at a rate to be determined after trial.

The cases were then tried in order to determine KAL's liability for the four deaths. The juries made the following awards:

*Oldham v. KAL:*
Death of John Oldham:

- a. to Nan M. Oldham (mother):
  - (1) loss of support: $ 26,000
  - (2) loss of society: $100,000
  - (3) ~~grief:~~ ~~$225,000~~*

- b. to Charlotte Oldham–Moore (sister):
  - (1) loss of financial support: $ 8,000
  - (2) loss of guidance, training, and advice: $ 25,000
  - (3) loss of society: $ 20,000
  - (4) ~~grief:~~ ~~$ 65,000~~*

- c. to Nancy Oldham Raab (sister):
  - (1) loss of society: $ 15,000
  - (2) ~~grief:~~ ~~$ 40,000~~*

- d. to William D. Oldham III (brother):
  - (1) loss of society: $ 20,000

 (2) ~~grief:~~              ~~$ 60,000~~*

 e. Pre-death pain and suffering:       $100,000

*Maikovich v. KAL:*
1. <u>Death of Allen Kohn</u>:
 a. to Robert Kohn (son):
  (1) loss of support, gifts, and contributions:
                 $120,000
  (2) loss of inheritance:       $434,000
  (3) loss of guidance, training, and advice: $ 50,000
  (4) loss of society:         $150,000
  (5) ~~grief:~~           ~~$180,000~~*

 b. to Joseph Kohn (son):
  (1) loss of gifts and contributions:   $ 60,000
  (2) loss of inheritance:       $433,000
  (3) loss of guidance, training, and advice: $ 30,000
  (4) loss of society:         $ 80,000
  (5) ~~grief:~~         ~~$ 80,000~~*

 c. to Marsha Maikovich (daughter):
  (1) loss of gifts and contributions:   $ 70,000
  (2) loss of inheritance:       $433,000
  (3) loss of guidance, training, and advice: $ 30,000
  (4) loss of society:         $100,000
  (5) ~~grief:~~         ~~$100,000~~*

 d. Pre-death pain and suffering:     $100,000

2. <u>Death of Lillian Kohn</u>:

 a. to Robert Kohn (son):
  (1) loss of gifts and contributions:   $ 70,000
  (2) loss of guidance, training, and advice: $ 50,000
  (3) loss of society:         $150,000
  (4) ~~grief:~~         ~~$130,000~~*

 b. to Joseph Kohn (son):
  (1) loss of gifts and contributions:   $ 60,000
  (2) loss of guidance, training, and advice: $ 30,000
  (3) loss of society:         $ 80,000
  (4) ~~grief:~~         ~~$ 80,000~~*

 c. to Marsha Maikovich (daughter):
  (1) loss of gifts and contributions:   $ 70,000
  (2) loss of guidance, training, and advice: $ 30,000
  (3) loss of society:         $100,000
  (4) ~~grief:~~         ~~$100,000~~*

 d. to Lillian Percy Beale (mother):
  (1) loss of society:         $ 50,000
  (2) ~~grief:~~         ~~$ 50,000~~*

 e. Pre-death pain and suffering:     $100,000

*Ocampo v. KAL:*

<u>Death of Suellen Ocampo</u>:
 a. to Edward Ocampo (husband):
  (1) loss of services:         $ 26,000

| | | |
|---|---|---|
| (2) | loss of society: | $ 35,000 |
| (3) | ~~grief:~~ | ~~$ 75,000~~* |

b. to the Estate of Suellen Ocampo:
(1) loss of net accumulated assets:     $ 63,016
(2) pre-death pain and suffering:     $ 0

\* All jury awards for grief were later stricken by the district court.

Following entry of final judgment in each case, KAL timely moved for judgment as a matter of law or, in the alternative, for a new trial or remittitur of damages. The district court granted KAL's motions to set aside all damage awards for survivors' grief but denied the motions in all other respects.

## B. Statement of Relevant Facts in the Individual Cases

### 1. *Oldham v. KAL*

This action was brought by Nan Oldham, the mother of decedent John R. Oldham, on her own behalf and as personal representative of his estate. She seeks pecuniary and nonpecuniary damages for herself, the estate and the decedent's three surviving siblings, Charlotte Oldham–Moore, Nancy Oldham Raab, and William D. Oldham III.

Mr. Oldham's parents, Dr. William Oldham and Nan Oldham, became separated in 1970 when she and her children returned to the United States from Taipei, Taiwan, where the family had lived since 1966. They were divorced in the following year. Since that time, Dr. Oldham has continued to live overseas and has had virtually no contact with his children. In fact, at the time of Mr. Oldham's death, his younger sister Charlotte, who was then 18, had not seen her father since she was one-and-one-half years old.

Mr. Oldham received his undergraduate degree from Princeton University. During his years there, he returned home during holidays and in the summers to be with his mother and siblings. In 1980, after a year abroad as a Fulbright scholar during his senior year of college, Mr. Oldham began a three-year program at Columbia University's law school, returning home to be with his family during vacations, in the summer, and about twice a month on weekends during the school year. There is ample testimony that during all these years, he took a special interest in the upbringing and education of his sister Charlotte and that she came to regard him as a surrogate father.

Following his graduation from law school in 1983, the law firm of Surrey & Morse offered him a job as an associate. Because he had an opportunity to teach the American legal system in China as a Ford Foundation Fellow, the firm rescheduled his starting date for June 1984 at the same salary. Mr. Oldham told a professor at the law school and a lawyer at Surrey & Morse about his family's background and about his belief that he bore the financial responsibility for supporting his mother and his sister Charlotte. (His sister Nancy had married in 1982.)

Mr. Oldham also mentioned to family members that he intended to provide financial assistance to his mother and Charlotte once he was earning a salary. Charlotte admitted that she had never received financial assistance from her brother. Although she expected that he would have helped finance her education, she did not know how much he would have contributed.

### 2. *Maikovich v. KAL*

Marsha J.K. Maikovich, daughter of decedents Allen and Lillian Kohn, sued for pecuniary and non-pecuniary damages on her own behalf and on behalf of her parents' estates. The Kohns were survived by three children, Marsha Maikovich, Joseph Kohn, and Robert Kohn, and Lillian Kohn's mother, Lillian Percy Beale. At the time of the crash, Allen Kohn was a 64–year-old stockbroker with Drexel Burnham Lambert ("Drexel Burnham"). He had spent his entire career at Drexel Burnham, having started to work for the firm in the mid–1950's. His compensation during the years from 1978 through 1982 ranged between $58,425 and $78,355. In 1983, his earnings up to September 1, the

day he died, totaled $106,365. In the approximately 30 years that he had worked, he had accumulated an estate of $1,500,000, all of which was distributed to his children after his death.

Decedent Lillian Kohn was 55 years old when she died. She was a homemaker who worked on occasion as a freelance writer. The only evidence of her earnings presented at the trial showed that she had been paid $11,654 in 1979.

The Kohns' two oldest children, Marsha Maikovich (age 29) and Joseph Kohn (age 26), were college educated, financially independent adults at the time of the crash. Both testified at the trial that, at the time of the crash, they were not receiving any money from the decedents for necessities and did not expect to need or receive financial support from them in the future. Nevertheless, the Kohns' children remained extremely close to their parents and telephoned them one or more times a week to share experiences and to discuss their problems. The evidence also indicated that the Kohns made frequent financial contributions to or on behalf of the adult children.

Their third child, Robert Kohn, was 17 years old and preparing to attend college at the time of the crash. When he turned 18, Robert assumed control of a custodial account containing $102,449 that had been established by Allen Kohn for Robert's education. Although the Kohns had established similar accounts for their other two children, their father paid for their college and postgraduate expenses out of other funds and gave these children the money in the custodial accounts. Robert ultimately received undergraduate and graduate degrees and, at the time of the trial, was working for a consulting firm outside of Pittsburgh.

### 3. *Ocampo v. KAL*

Decedent Suellen Ocampo, who was 39 years old at the time of her death, lived with her husband Edward Ocampo (the plaintiff in this case), their two minor children (ages 3 and 4), and her mother. Although Mrs. Ocampo's mother and two children were also killed in the KE007 crash, their claims were settled prior to trial. The trial therefore concerned only KAL's liability to Mr. Ocampo and to his wife's estate.

The decedent was a licensed pharmacist who earned approximately $32,000 a year. At the time of the crash, Mr. Ocampo was employed at a brokerage firm. He had previously worked as a housekeeper and as a restaurant manager. His mother-in-law looked after the two children and was fully dependent on the Ocampos for her financial support.

At the trial, Mr. Ocampo testified that he had contributed about 40 percent of the family's total support and that he and his wife had placed all of their money in a joint account from which he received $20 a week. He also testified that his wife paid the household bills from the account. The Ocampos owned a home in Staten Island, New York, for which they had made a $20,000 down payment that virtually exhausted their savings. Mr. Ocampo failed to present any evidence that would indicate either the size of their family expenses or the extent to which the expenses had been paid by the decedent.

## II. ANALYSIS

We will address the issues common to all three cases and then discuss the issues particular to *Oldham*, *Maikovich*, and *Ocampo* in that order.

### A. Claims Common to the Three Cases

#### 1. *This Court's July 26, 1996 Order*

■ Following the parties' submissions of briefs in these appeals, we ordered that the cases be held in abeyance pending the decision of the Supreme Court in *Zicherman v. Korean Air Lines Co., Ltd.*, — U.S. —, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). Order dated September 20, 1995. The Supreme Court issued its decision on January 16, 1996, which held, *inter alia*, that

> Articles 17 and 24(2) of the Warsaw Convention permit compensation only for legally cognizable harm, but leave the specification of what harm is legally cognizable to the domestic law applicable under the forum's choice-of-law rules. Where, as [in the case of Flight KE007], an airplane

crash occurs on the high seas, DOHSA supplies the substantive United States law.... DOHSA permits only pecuniary damages....

*Id.* at ——, 116 S.Ct. at 637. The Court, however, explicitly declined to consider whether DOHSA permits the recovery of damages for a decedent's pain and suffering. *Id.* at —— n. 4, 116 S.Ct. at 636 n. 4. KAL moved for permission to submit a supplemental brief to address the recoverability of such damages under DOHSA. We directed the parties to file replacement briefs "limited in scope to those issues which were raised in the parties' first [submissions]" and dismissed as moot KAL's motion for leave to file supplemental papers. Order dated July 26, 1996.

In its replacement briefs, KAL challenged the availability of damages for pre-death pain and suffering under DOHSA even though it had failed to raise that issue in its earlier submission. KAL claims that our July 26 Order implicitly permitted it to argue the question because, it asserts, we would not have dismissed its request as moot unless we intended to allow it to discuss the matter. KAL is mistaken. Our July 26 Order clearly stated that the parties' replacement briefs would be "limited in scope to those issues" raised in the first submissions. We dismissed KAL's motion as moot because our instructions indicated that KAL could not address the availability of pre-death pain and suffering damages if the question had not previously been raised.

KAL offers no reason why it could not have raised the issue in its initial briefs. This is hardly surprising because it was well aware of its existence long before the Supreme Court's decision in *Zicherman.* In fact, KAL's counsel had argued the unavailability of damages for pre-death pain and suffering before the district court and in several related cases elsewhere in the country. Accordingly, we will not consider KAL's claim that such damages are unavailable as a matter of law. *See Bickel v. Korean Air Lines Co., Ltd.,* 96 F.3d 151, 153–54 (6th Cir.1996) (declining, in a related case, to address pre-death pain and suffering claims because issue was not raised in initial briefs),

*cert. denied,* —— U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997).

### 2. *Loss of Society*

■ KAL contends that the district court erred in holding that damages for loss of society were available under Article 17 of the Warsaw Convention. Although such damages are recoverable under general maritime law, *see Sea–Land Servs., Inc. v. Gaudet,* 414 U.S. 573, 585, 94 S.Ct. 806, 815, 39 L.Ed.2d 9 (1974), the Supreme Court ruled, in *Zicherman,* that "where DOHSA applies, neither state law ... nor general maritime law ... can provide a basis for recovery of loss-of-society damages," —— U.S. at ——, 116 S.Ct. at 632 (citations omitted), and that "[b]ecause DOHSA permits only pecuniary damages, petitioners are not entitled to recover for loss of society." *Id.* at ——, 116 S.Ct. at 637. Accordingly, the awards for loss of society are disallowed.

### B. *Oldham v. KAL*

■ The jury awarded decedent John Oldham's younger sister, Charlotte Oldham–Moore, $8,000 for loss of support and $25,000 for loss of guidance, training, and advice. KAL argues that because Charlotte was not dependent on her brother prior to or at the time of his death, she cannot recover these damages under DOHSA.

The district court rejected this argument, reasoning that

> [a]lthough KAL is correct that recovery for loss of guidance, training, and advice under ... DOHSA[ ] has generally been limited to a decedent's children, in light of the Warsaw Convention's intent to compensate claimants for "damage sustained," this Court finds that whether recovery for loss of guidance, training, and advice is permissible depends upon the factual circumstances giving rise to such a claim.

*Oldham v. Korean Air Lines Co., Ltd.,* C.A. No. 83–3889, 1994 WL 725277, mem. op. at 16 (D.D.C. Oct. 11, 1994). The court noted that it had instructed the jury that "in order for Charlotte to recover, you must find from the evidence that John Oldham acted in place of a parent or a father for her." *Id.* With

respect to loss of support, the court found that, because the mother and sister had testified to conversations in which Mr. Oldham had pledged to provide them with financial assistance in the future, there was sufficient evidence in the record to sustain the jury award.

As we have explained, the district court erred in relying on the Warsaw Convention. *See Zicherman,* —— U.S. at —— – ——, 116 S.Ct. at 634–36. Moreover, under DOHSA, a suit for damages may be brought only "for the exclusive benefit of the decedent's wife, husband, parent, child or dependent relative." 46 U.S.C. app. § 761; *see Evich v. Connelly,* 759 F.2d 1432, 1433 (9th Cir.1985) ("Siblings must prove their dependency in order to bring a DOHSA action."). For dependency to exist, "there must be a legal or voluntarily created status where the contributions are made for the purpose and have the result of maintaining or helping to maintain the dependent in his customary standard of living." *Petition of United States,* 418 F.2d 264, 272 (1st Cir.1969) (quoting *United States Fidelity & Guaranty Co. v. Britton,* 188 F.2d 674, 675 (D.C.Cir.1951)).

We agree with KAL that there is no evidence that Charlotte was financially dependent upon her brother. To the contrary, the record shows that she was supported by her mother and that Mr. Oldham had never provided her with any financial support prior to his death. Although there was evidence that Mr. Oldham had promised his mother and sister that he would support them in the future, a pledge of future performance is insufficient to establish a present state of dependency. Accordingly, we reverse the awards.

### C. *Maikovich v. KAL*

KAL argues that, in *Maikovich,* the district court erred in allowing damage awards for the following: (1) the Kohn children's loss of inheritance; (2) their loss of gifts and contributions and of support; (3) their loss of guidance, training, and advice; and (4) the decedent's pain and suffering.

### 1. *Loss of Inheritance*

The jury awarded the Kohn children $1.3 million for loss of inheritance. The district court then employed the "Ibbotson Index" (a stock market index that tracks the rate of return on investments in traded securities) in calculating the prejudgment interest, which increased the total to approximately $5 million. KAL challenges this award on four grounds. KAL claims, first, that the court abused its discretion when it admitted testimony by the plaintiff's expert witness, Dr. Thomas C. Borzilleri. KAL relies on *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 568 (D.C.Cir.1993) (holding that admission of expert testimony was abuse of discretion when testimony was pure conjecture unsupported by the record), to argue that Dr. Borzilleri's testimony should have been excluded because his calculations and method of projecting the loss of inheritance were "rampant speculation." Second, it argues that the award is not supported by sufficient evidence in the record. Third, KAL contends that the amounts awarded for the losses of gifts and contributions should have been deducted from the awards for losses of inheritance. Fourth, it argues that the court erred in its calculation of prejudgment interest.

Each side presented expert testimony on the value of the Kohn children's lost inheritance. The testimony focused on two related questions: (1) How much would have been added to the children's inheritance out of Mr. Kohn's future earnings if he had not died prematurely; and (2) how much larger, if at all, would the inheritance have been if Mr. Kohn had been able to continue to manage the $1.5 million securities portfolio beyond 1983.

With respect to the first question, the parties' experts projected Mr. Kohn's future earnings over their respective estimates of his future work life, added a percentage for fringe benefits that Mr. Kohn would have received from his employer, and deducted taxes and personal/family expenses in order to arrive at annual savings that his children would have ultimately inherited. In his initial presentation, Dr. Borzilleri estimated the value of the accrued savings to be $1.6 mil-

lion in 1993 dollars (1993 being the year the trial took place), while KAL's expert, Dr. John Glennie, valued the savings at $256,000 in 1983 dollars (the year of the crash).

The disparity between Dr. Borzilleri's and Dr. Glennie's initial estimates results largely from three critical differences in their assumptions and methodologies. First, the experts used different "base" incomes for their projections. While they both attributed to Mr. Kohn an annualized 1983 income of approximately $162,000 based on his earnings prior to his death on September 1, 1983, Dr. Borzilleri used that figure as his base in computing what Mr. Kohn would have earned in succeeding years. But because Dr. Glennie considered those earnings aberrational (they were more than twice as large as those of any previous year), he used Mr. Kohn's 1982 earnings of $76,118 as the basis for his projections.

Second, because a stockbroker's compensation usually consists of commissions, both experts agreed that Mr. Kohn's income would reflect changes in the volume or value of the trading on the New York Stock Exchange ("Exchange"), but they arrived at different correlations between his earnings and those changes. Dr. Borzilleri assumed that Mr. Kohn's income would have gone up or down in direct proportion to any increase or decrease in the prices of stocks traded on the Exchange (e.g., if the value of the market increased by 10 percent, so would Mr. Kohn's commissions). Dr. Glennie, however, examined Mr. Kohn's brokerage income for the years 1972 through 1982 (once again rejecting the 1983 earnings as unrepresentative) and determined that, on average, Mr. Kohn's earnings rose or fell at about half the rate of change in the trading volume on the Exchange (e.g., if the trading volume increased by 10 percent, his earnings would increase by five percent). While Dr. Borzilleri based his projections on changes in prices on the Exchange and Dr. Glennie based his on changes in trading volume, they both agreed that whether one looks at price or volume makes little difference in the final outcome.

Third, the experts disagreed on the age at which Mr. Kohn would have retired. Dr. Borzilleri testified that, although the children had never heard their father speak of retiring and believed that he would have died on the job, he adopted the more conservative assumption that Mr. Kohn would have worked until he reached the age of 74. In contrast, Dr. Glennie relied solely on work life expectancy charts published by the Bureau of Labor Statistics of the U.S. Department of Labor to conclude that Mr. Kohn would have retired four-and-a-half years earlier, at age 69. He claimed that these charts were more objective than the children's testimony. On cross-examination, Dr. Borzilleri stated that he had done his doctoral thesis on the subject of retirement and emphasized that the Department of Labor chart reflected the average retirement age of all persons. He noted that while laborers tended to retire before they reached the average age, high income professionals tended to fall into two groups: those who retire very early and "fish the rest of their lives" and the rest, who continue working past the average retirement age. He also indicated that the charts yield strange results for certain groups of people. For example, an 18–year–old is estimated to retire at age 55 even though, in reality, most people are not financially able to do so.

There were other differences in the two experts' assumptions. Dr. Borzilleri, for example, estimated that Mr. Kohn would have received fringe benefits amounting to 10 percent of his annual compensation whereas Dr. Glennie assumed a rate of 23 percent; and although Dr. Borzilleri's calculations of accrued savings ended with Mr. Kohn's actuarial death in 1998, Dr. Glennie's projections extended to the year 2008, when his widow would have reached the end of her life expectancy, on the assumption that there would have been no distribution to the children until that time.

We need not analyze these differences because, on rebuttal, Dr. Borzilleri adopted Dr. Glennie's methodology and assumptions in all but two respects. First, he rejected the assumption that Mr. Kohn's 1983 earnings were aberrational. He therefore used them both as his base for projecting Mr. Kohn's subsequent earnings and in determining the correlation of those earnings with fluctua-

tions of the market. Thus, employing Dr. Glennie's methodology but including the 1983 earnings in his calculations, he concluded that, on average, Mr. Kohn's earnings changed at about 87 percent of the rate of change in trading volume on the Exchange. Second, Dr. Borzilleri continued to assume that Mr. Kohn would have worked until he reached the age of 74.

Having adopted Dr. Glennie's assumptions and methodology in every respect but these, Dr. Borzilleri calculated the children's loss, in 1983 dollars, to be $1.3 million. Dr. Borzilleri noted that this result was virtually the same as the one he had reached in his initial presentation because the net lost earnings of $1.6 million to which he had earlier testified was stated in 1993 dollars, which is equivalent to $1.2 million in 1983 dollars.

Because, in awarding damages for the loss of inheritance, the jury used the exact figure Dr. Borzilleri had arrived at in his rebuttal testimony, we conclude that the award was based on that testimony. *See Sandberg v. Virginia Bankshares, Inc.*, 891 F.2d 1112, 1123 (4th Cir.1989) ("The verdict that Sandberg's stock was worth $60 at the time of the merger clearly evinces acceptance by the jury of the testimony of her expert witness."); *Cities Service Gas Co. v. FPC*, 535 F.2d 1278, 1287 & n. 46 (D.C.Cir.1976) (finding that where jury award differed from expert's multimillion dollar evaluation by only 67 cents, the jury "must have accepted" that expert's assumptions). The question before us, then, is whether there was sufficient evidence to support the two key changes that Dr. Borzilleri made in his opposing expert's assumptions. We believe there was.

■ In his cross-examination, KAL's counsel sought to discredit Dr. Borzilleri's use of Mr. Kohn's 1983 compensation in his projections of Mr. Kohn's post–1983 income. He specifically challenged their inclusion in the calculation of "average earnings" that Dr. Borzilleri used to correlate his earnings with the volume of trading on the New York Stock Exchange. In answering counsel's questions, Dr. Borzilleri acknowledged that economists and statisticians typically used the median sum, i.e., the middle of a set of numbers, rather than the average because averages

are influenced by extreme values whereas medians are not. He nevertheless defended his reliance on the 1983 earnings, stating that he knew of no basis for ignoring a number merely because it was too big and that anomalies must be scrutinized, not discarded out of hand.

Dr. Borzilleri agreed that the 1983 earnings were large when compared with those of previous years. But given the dramatic developments that had taken place in the securities markets in late 1982 and 1983, he thought they provided an appropriate basis for projecting future income. As he had earlier testified while presenting an Ibbotson Associates chart illustrating the returns on various kinds of investments, August 1982 marked the beginning of one of the three strongest bull markets in our nation's history. Between then and the end of the bull market in August 1987, the value of investments in stocks with dividends reinvested nearly quadrupled, which represented a compound rate of return of 30.1 percent. Dr. Borzilleri maintained, therefore, that the likely explanation for the size of Mr. Kohn's 1983 earnings was that the stock market had "taken off." We believe that this evidence, combined with the correlation that both experts agreed existed between the market and a stockbroker's earnings, was sufficient to enable a reasonable jury to conclude that Dr. Borzilleri's use of the 1983 earnings was appropriate.

■ There was also ample support in the record for his assumption that Mr. Kohn would have continued to work until he was 74. As we noted earlier, his children testified that their father had stated that he would never retire. The record also indicates that there was no retirement age at Drexel Burnham, that a former colleague at that firm was 73 years old and still working, and that Mr. Kohn had been a healthy, vigorous man. Accordingly, it would not have been irrational for the jury to accept this key assumption.

Because the award for the loss of inheritance was based on Dr. Borzilleri's computation, in rebuttal, of the savings Mr. Kohn would have accumulated but for his prema-

ture death, we do not reach the second question the experts were asked to address, namely, whether the heirs had suffered a loss resulting from the distribution to them of $1.5 million in securities that would otherwise have remained under their father's management.

■ Although we reject KAL's challenges to the jury's loss of inheritance award, we are persuaded by its contention that the Kohn children may well have received a double recovery in this case resulting from the awards to them of a total of $450,000 for the loss of gifts and contributions from their parents. Because the computation on which the $1.3 million loss of inheritance award was predicated did not include deductions for such gifts, these losses should have been deducted from the amounts awarded for loss of inheritance unless there was evidence that the parents would have used funds other than those earned and saved by Mr. Kohn in making the gifts. Accordingly, we vacate the district court's decision not to deduct the awards for gifts and contributions from those for the loss of inheritance and remand for further proceedings to determine whether the awards resulted in double recoveries, and if so, to what degree.

■■ Lastly, KAL objects both to the district court's award of prejudgment interest on the loss of inheritance awards and to the means by which the interest rate was calculated. "[W]hether pre-judgment interest is to be awarded is subject to the discretion of the court and equitable considerations." *Motion Picture Ass'n of Amer., Inc. v. Oman,* 969 F.2d 1154, 1157 (D.C.Cir.1992). The purpose of such awards is to compensate the plaintiff for any delay in payment resulting from the litigation. *See id.* ("interest compensates for the time value of money, and thus is often necessary for full compensation"). KAL argues that because Dr. Borzilleri stated his loss of inheritance calculations in 1993 dollars, there was no need to add prejudgment interest. Although that was true of his initial presentation, we have concluded that the jury's $1.3 million award was based on Dr. Borzilleri's rebuttal testimony, which was stated in 1983 dollars. Ac-

cordingly, the court did not abuse its discretion in awarding prejudgment interest.

■■ The question that remains is whether the court abused its discretion when it directed that the Ibbotson Index be used to determine how much interest was payable. We observed in a recent case that the prime rate, i.e., the rate that banks charge for short-term unsecured loans to credit-worthy customers, is an appropriate measure of prejudgment interest. *Forman v. Korean Air Lines Co., Ltd.,* 84 F.3d 446, 450 (D.C.Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 582, 136 L.Ed.2d 513 (1996). Although the court used the prime rate for all the other damage awards in these cases, it employed the Ibbotson Index in the case of the loss of inheritance award. The court reasoned that because that loss reflected

> what Mr. Kohn would have made as a stockbroker and what he had saved through stock market transactions, ... the Ibbotson Index is the best tool for determining what interest the children could have made on the money if they had received it in 1983—when the accident occurred.

*Maikovich v. Korean Air Lines Co., Ltd.,* C.A. No. 83–3792, 1993 WL 441954, mem. op. at 3 (D.D.C. July 16, 1993). We are not persuaded by this reasoning. What Mr. Kohn would have made and saved is irrelevant to the question of what constitutes appropriate compensation for a delay in a successful party's receipt of a cash payment. The time value of the money is the same whether paid in satisfaction of an award for a loss of inheritance or a loss of society. Accordingly, we strike the award and remand for recomputation.

### 2. *Loss of Support, Gifts, and Contributions*

Under DOHSA, recovery in a wrongful death action occurring on the high seas "shall be a fair and just compensation for the pecuniary loss" sustained by the decedent's wife, husband, parent, child, or dependent relative. 46 U.S.C. app. §§ 761, 762. The district court determined that the Kohns' 17–year-old son, Robert, but not their two adult children, could recover for loss of support, which

"includes all the financial contributions that the decedent would have made to his dependents had he lived," *Gaudet,* 414 U.S. at 584–85, 94 S.Ct. at 814–15. The court decided, however, that all three could recover for the loss of gifts and financial contributions that, based on past experience, they could reasonably have expected to receive from their parents in the future. The jury awarded the three children an aggregate of $250,000 to compensate them for the loss of their father's support (in the case of Robert), gifts, and contributions and an aggregate of $200,000 for the loss of their mother's gifts and contributions.

KAL challenges these awards on three grounds. First, it claims that the loss of support award for Robert should have been limited to support until he reached the age of 18. Second, it argues that the awards to the adult children for loss of gifts and of contributions are not permitted under DOHSA. Third, it contends that the awards for the losses of gifts from Lillian Kohn should be struck because she had virtually no income independent of her husband.

### a. Loss of Support for Robert Kohn

■ KAL contends that the award for loss of support of Robert Kohn should be set aside. Although Robert was a 17–year–old minor at the time of the plane crash, he was preparing to go away to college. Mr. Kohn had established a custodial account containing more than $100,000 for his education, which was distributed to him when he turned 18. According to KAL, there was no evidence that Robert would have been financially dependent on his parents after reaching that age because the money in the account was sufficient to meet his education and living expenses.

KAL ignores uncontradicted testimony that the Kohns had provided their older children, Marsha and Joseph, with complete financial support through college and graduate school notwithstanding the existence of similar custodial accounts for their benefit. Under the circumstances, we are satisfied that the jury was entitled to conclude that, had they survived, the Kohns would have continued to support Robert financially until he had completed his college and graduate school education. Accordingly, we affirm the award.

### b. Loss of Gifts and Contributions to Adult Children

■ Contrary to what KAL argues, there is nothing in DOHSA that prohibits an award for an adult's loss of financial gifts and contributions. In fact, the statute does not limit the kinds of losses for which damages may be awarded so long as they are pecuniary in nature. There is no question that the loss of prospective financial contributions is pecuniary in nature. Accordingly, we find no error.

### c. Loss of Gifts and Contributions from Lillian Kohn

■ KAL maintains that the district court erred when it rejected KAL's motion to set aside the jury awards to the three children for the loss of gifts and contributions from their mother. It notes that the record contains no evidence that Mrs. Kohn received any income other than the $11,653 she earned in 1979 or that she provided gifts or contributions out of her own resources. Therefore, KAL argues, these awards represent double recoveries by the children. We agree with the court, however, that there was sufficient evidence that Mrs. Kohn had used funds from the joint checking account she shared with her husband to make gifts and contributions to her children to support the conclusion that she would have continued to do so in the future. Accordingly, we affirm the awards.

### 3. Loss of Guidance, Training, and Advice

■ DOHSA permits recovery for the monetary value of services a decedent would have continued to provide but for his wrongful death. "Such services include ... the nurture, training, education, and guidance that a child would have received had not the parent been wrongfully killed." *Gaudet,* 414 U.S. at 585, 94 S.Ct. at 815. The district court recognized that, under DOHSA, recovery for loss of guidance, training, and advice has generally been limited to that provided a decedent's minor children. It nevertheless

concluded that awards to adult children for such losses were permissible under the Warsaw Convention.

▆▆▆▆▆ As became clear when the Supreme Court issued its intervening decision in *Zicherman,* — U.S. at ——–——, 116 S.Ct. at 634–36, the district court erred in relying on the Convention. Moreover, we agree with the Second and Fifth Circuits that, under DOHSA, damages for loss of parental guidance and training are available to adult children only if there is a very specific showing that "their parents' guidance had a pecuniary value beyond the irreplaceable values of companionship and affection." *Solomon v. Warren,* 540 F.2d 777, 789 (5th Cir.1976) (quoting *First Nat'l Bank in Greenwich v. National Airlines, Inc.,* 288 F.2d 621, 624 (2d Cir.1961)); *see also In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988,* 37 F.3d 804, 830 (2d Cir.1994).

The evidence at the trial indicated that, after reaching her majority, Marsha Maikovich lived with her parents during her first year of law school, sought advice and guidance from them about career choices after she had received her law degree, discussed medical options when she was ill in the hospital, discussed childbearing and parenting issues with her mother, and sought her father's advice on financial matters such as investments and home ownership. Similarly, Joseph Kohn testified that he lived with his parents after graduating from college, worked at Drexel Burnham with his father, and discussed with him his decision to pursue a master's degree in business. After leaving graduate school, he sought advice from his father about workplace dynamics and investment matters.

In short, the evidence showed that the Kohns were interested, loving, and helpful parents. Although we have no doubt that Marsha and Joseph placed great value on the counseling that they sought and continued to receive from their parents, there is nothing in the record to show that these children suffered a financial loss as a result of their inability to receive such guidance after 1983. Accordingly, we reverse the awards to Marsha and Joseph for loss of guidance, training, and advice and remand the award to Robert so that the district court may determine the value of the loss that he suffered between the time of the crash and his eighteenth birthday.

Because we reverse the jury awards on this issue, we need not consider KAL's argument that the claimants are not entitled to prejudgment interest on those awards. We express no opinion on whether prejudgment interest may be appropriate on any award that Robert may receive for the loss of guidance, training, and advice prior to his eighteenth birthday but leave that determination to the district court.

### 4. *Pre–Death Pain and Suffering*

▆▆▆▆ Although we have declined to consider KAL's claim that damages for pre-death pain and suffering are not available under DOHSA because it was not raised in its initial briefs, see *supra* at 50, we will consider its timely argument that there was insufficient evidence to support the jury awards of $100,000 for the pre-death pain and suffering of each of the three decedents in *Maikovich* and *Oldham.*

As we noted in *Forman,* the "key factual dispute turns on whether the passengers were immediately rendered unconscious." 84 F.3d at 449. Expert witnesses for the plaintiffs in *Maikovich* and *Oldham* addressed this issue. In *Maikovich,* one expert testified that although shrapnel from a Soviet missile had penetrated the rear of the plane, it had not caused the aircraft to explode or to disintegrate. He then stated that because Mr. and Mrs. Kohn were seated over the wing, they would have been able to don their oxygen masks after the missile attack and would have been fully conscious and aware of the events around them until the plane hit the water. Similarly, an expert for the plaintiff in *Oldham* testified that the shrapnel would not have reached the seat assigned to John Oldham and that the drop in pressure within the plane automatically would have caused the oxygen masks to drop in front of the passengers.

A second expert in *Maikovich* testified that a rapid decrease in air pressure within the cabin could have resulted in ruptured

eardrums, the tearing of sinus tissue and of the lungs, and a buildup of pressure in the stomach or intestines. He stated that the Kohns would have experienced physical pain from one or more of these causes and would have suffered mental pain as well. An expert in *Oldham* described the effects of decompression on the human body and testified that Mr. Oldham would have experienced physical pain, anxiety, and fear.

Although KAL asks us to dismiss this testimony as speculative because there was nothing in the record to confirm that the three decedents had in fact survived the Soviet strike and had remained conscious and experienced pain, we find that the evidence presented in these cases was substantially similar to that which we found sufficient in *Forman. See* 84 F.3d at 449–50; *see also Bickel,* 96 F.3d at 155–56 (finding sufficient evidence of pre-death pain and suffering in same accident); *Hollie v. KAL,* 60 F.3d 90, 92–93 (2d Cir.1995) (same), *judgment vacated on other grounds and case remanded,* —— U.S. ——, 116 S.Ct. 808, 133 L.Ed.2d 754 (1996); *Zicherman v. KAL,* 43 F.3d 18, 23 (2d Cir.1994) (same), *rev'd in part on other grounds,* —— U.S. ——, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). Accordingly, we affirm the awards.

### D. *Ocampo v. KAL*

Plaintiff Edward Ocampo, who brought this action on his own behalf and as administrator of his wife's estate, contends that the district court made three trial errors: (1) it employed an overly narrow definition of loss of support and, as a result, incorrectly directed a verdict for KAL; (2) it improperly instructed the jury on his claim of "loss of the net accumulated assets"; and (3) it improperly admitted evidence of his salary.

#### 1. *Loss of Support*

■ Mr. Ocampo argues that the district court misunderstood the nature of a loss of support claim by equating it with the costs associated with the basic necessities of life. According to him, the trial judge should have permitted damages for "loss of pecuniary benefits" or "loss of financial contributions" equivalent to his wife's gross earnings less taxes and her personal consumption.

We disagree. As an initial matter, the record does not support Mr. Ocampo's assertion that the district court limited his claims to the costs associated with the basic necessities of life. Rather, it characterized loss of support as

> the loss of anything from which he economically benefitted directly. If [Mrs. Ocampo] made a contribution toward his ability to maintain himself, in any form that can be measured economically, that's what he lost when she died.

Transcript of Trial Proceedings, May 5, 1993, at 135. The court also noted that in order to determine what that contribution was, it would be necessary to take into account Mrs. Ocampo's expenditures for the benefit of her children and mother as well as such family expenses as the payments due on their mortgage.

Regardless of how the loss is defined, we find no error. Mr. Ocampo failed to present any evidence that would demonstrate the extent to which he personally benefitted from the decedent's earnings. He testified that he and his wife both worked full time, that he earned approximately 40 percent of the family's income, and that they deposited their earnings in a joint bank account from which he received approximately $20 a week. He did not testify to having received any other money from either the account or his wife, and he presented no evidence concerning the breakdown of household expenses.

We find this case distinguishable from *Forman* because the evidence there indicated that the "Formans' was a share-and-share-alike household such that the jury could reasonably find that whatever portion of Evelyn's earnings remained after taxes and after her personal consumption would redound to Eric's benefit." 84 F.3d at 450. In this case, Mr. Ocampo failed to provide any evidence that would indicate how much of his wife's earnings would redound to his benefit as compared to that of his children and mother-in-law. Thus, the district court properly directed a verdict for KAL on this issue.

### 2. *Loss of Net Accumulated Assets*

■ The district court instructed the jury that Mr. Ocampo was entitled to recover damages for the "loss of the net accumulated assets" suffered by him in his capacity as administrator of his wife's estate. Mr. Ocampo argues that because the instruction limited the recovery to losses suffered by him in his capacity as administrator and because it equated the loss with a mere loss of inheritance, the court hopelessly confused the jury. As a consequence, he states, the jury ignored expert testimony to the effect that had she not died in the crash, his wife would have accrued more than $1.5 million in net earnings that would have been available to him.

We see no reason to question the district court's instruction. The court had already ruled that Mr. Ocampo had failed to introduce any evidence that would have enabled a jury to award damages for the loss of financial contributions. Therefore, it was entirely appropriate for it to advise the jury that the claim for loss of net accumulated assets was being made on behalf of the estate and that, in making the award, the jury would have to determine what property Mrs. Ocampo would probably have accumulated from her earnings and pension benefits had she not died. The jury was not confused by this instruction. Mr. Ocampo's economist testified that, based on the decedent's earnings and after appropriate deductions, his wife would have been able to save approximately $18,562 between 1983 and the time of trial and an additional $34,454 thereafter. The jury awarded $18,562 for the past loss of net accumulated assets and $44,454 for future losses (i.e., $10,000 more than the expert's estimate).

### 3. *Evidence of Mr. Ocampo's Salary*

■ Mr. Ocampo also argues that the district court erred in admitting the amount of his salary into evidence, which he claims is inadmissible in a wrongful death action. He fails to explain how he has been harmed by this admission. The district court did not rely on this evidence when it found in favor of KAL on the loss of support claim. Ac-cordingly, if there was any error, it was harmless.

### III. CONCLUSION

For the reasons set forth above, the district court's rulings are affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

*It is so ordered.*