ZICHERMAN, INDIVIDUALLY AND AS EXECUTRIX OF
THE ESTATE OF KOLE, ET AL. v. KOREAN
AIR LINES CO., LTD.

No. 94–1361.   Argued November 7, 1995—Decided January 16, 1996*

*Together with No. 94–1477, *Korean Air Lines Co., Ltd.* v. *Zicherman, Individually and as Executrix of the Estate of Kole, et al.*, also on certiorari to the same court.

SCALIA, J., delivered the opinion for a unanimous Court.

*W. Paul Needham* argued the cause for petitioners in No. 94–1361 and respondents in No. 94–1477. With him on the briefs was *Kevin M. Hensley.*

*Andrew J. Harakas* argued the cause for Korean Air Lines Co., Ltd., in both cases. With him on the briefs was *George N. Tompkins, Jr.*†

JUSTICE SCALIA delivered the opinion of the Court.

This action presents the question whether, in a suit brought under Article 17 of the Warsaw Convention governing international air transportation, Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T. S. No. 876 (1934) (reprinted in note following 49 U. S. C. App. § 1502 (1988

†*Juanita M. Madole, Donald W. Madole, George E. Farrell, Milton G. Sincoff,* and *Steven R. Pounian* filed a brief for Philomena Dooley et al. as *amici curiae* urging reversal.

Briefs of *amicus curiae* were filed for Pan American World Airways, Inc., by *Richard M. Sharp* and *Frederick C. Schafrick;* and for the Plaintiffs' Committee in *In re Air Crash Disaster at Lockerbie, Scotland,* by *Lee S. Kreindler, Steven R. Pounian, James P. Kreindler, Paul S. Edelman, Frank H. Granito, Jr., Frank H. Granito III,* and *Michel F. Baumeister.*

ed.)), a plaintiff may recover damages for loss of society resulting from the death of a relative in a plane crash on the high seas.

I

On September 1, 1983, Korean Air Lines Flight KE007, en route from Anchorage, Alaska, to Seoul, South Korea, strayed into air space of the Soviet Union and was shot down over the Sea of Japan. All 269 persons on board were killed, including Muriel Kole. Petitioners Marjorie Zicherman and Muriel Mahalek, Kole's sister and mother, respectively, sued respondent Korean Air Lines Co., Ltd. (KAL), in the United States District Court for the Southern District of New York. Petitioners' final amended complaint contained three counts, entitled, respectively, "Warsaw Convention," "Death on the High Seas Act," and "Conscious Pain and Suffering." At issue here is only the Warsaw Convention count, in which petitioners sought "judgment against KAL for their pecuniary damages, for their grief and mental anguish, for the loss of the decedent's society and companionship, and for the decedent's conscious pain and suffering." App. 29.

Along with other federal-court actions arising out of the KAL crash, petitioners' case was transferred to the United States District Court for the District of Columbia for consolidated proceedings on common issues of liability. There, a jury found that the destruction of Flight KE007 was proximately caused by "willful misconduct" of the flight crew, thus lifting the Warsaw Convention's $75,000 cap on damages. See Warsaw Convention, Art. 25, 49 Stat. 3020; Order of Civil Aeronautics Board Approving Increases in Liability Limitations of Warsaw Convention and Hague Protocol, reprinted in note following 49 U. S. C. App. § 1502 (1988 ed.). The jury awarded $50 million in punitive damages against KAL. The Court of Appeals for the District of Columbia Circuit upheld the finding of "willful misconduct," but vacated the punitive damages award, holding that the Warsaw Convention does not permit the recovery of punitive dam-

ages. *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F. 2d 1475, 1479–1481, 1484–1490, cert. denied, 502 U. S. 994 (1991). The individual cases were then remanded by the Judicial Panel on Multidistrict Litigation to the original transferor courts for trial of compensatory damages issues.

At petitioners' damages trial in the Southern District of New York, KAL moved for determination that the Death on the High Seas Act (DOHSA), 41 Stat. 537, 46 U. S. C. App. § 761 *et seq.* (1988 ed.), prescribed the proper claimants and the recoverable damages, and that it did not permit damages for loss of society. The District Court denied the motion and held, *inter alia,* that petitioners could recover for loss of "love, affection, and companionship." *In re Korean Air Lines Disaster of Sept. 1, 1983*, 807 F. Supp. 1073, 1086–1088 (1992). The jury awarded loss-of-society damages in the amount of $70,000 to Zicherman and $28,000 to Mahalek.[1]

The Court of Appeals for the Second Circuit set aside this award. Applying its prior decisions in *In re Air Disaster at Lockerbie, Scotland, on Dec. 21, 1988*, 928 F. 2d 1267, 1278–1279 *(Lockerbie I),* cert. denied *sub nom. Rein* v. *Pan American World Airways, Inc.,* 502 U. S. 920 (1991), and *In re Air Disaster at Lockerbie, Scotland, on Dec. 21, 1988*, 37 F. 3d 804 (1994) *(Lockerbie II),* cert. denied *sub nom. Pan American World Airways, Inc.* v. *Pagnucco,* 513 U. S. 1126 (1995), it held that general maritime law supplied the substantive law of compensatory damages to be applied in an action under the Warsaw Convention. 43 F. 3d 18, 21–22 (1994). Then, following its decision in *Lockerbie II,* it held that, under general maritime law, a plaintiff is entitled to recover loss-of-society damages, but only if he was a depend-

---

[1] The jury also awarded petitioners $161,000 in survivors' grief, $16,000 to Zicherman for loss of support and inheritance and $100,000 to Zicherman for the decedent's pain and suffering. The Second Circuit has set aside the award of grief damages and has remanded for further proceedings on the award for loss of support and inheritance. None of these awards is at issue here.

ent of the decedent at the time of death. 43 F. 3d, at 22. The court concluded that as a matter of law Mahalek had not established that status, and therefore vacated her award; it remanded to the District Court for determination of whether Zicherman was a dependent of Kole. *Ibid.*

In their petition for certiorari, petitioners contended that under general maritime law dependency is not a requirement for recovering loss-of-society damages. In a cross-petition, KAL contended that the Warsaw Convention does not allow loss-of-society damages in this case, regardless of dependency. We granted certiorari. 514 U. S. 1062 (1995).

## II

Article 17 of the Warsaw Convention, as set forth in the official American translation of the governing French text, provides as follows:

> "The carrier shall be liable for *damage sustained* in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." 49 Stat. 3018 (emphasis added).

The first and principal question before us is whether loss of society of a relative is made recoverable by this provision.

It is obvious that the English word "damage" or "harm"— or in the official text of the Convention, the French word *"dommage"*[2]—can be applied to an extremely wide range of phenomena, from the medical expenses incurred as a result

---

[2] The French text of Article 17 reads:

"Le transporteur est responsable du dommage survenu en cas de mort, de blessure ou de toute autre lésion corporelle subie par un voyageur lorsque l'accident qui a causé le dommage s'est produit à bord de l'aéronef ou au cours de toutes opérations d'embarquement et de débarquement." 49 Stat. 3005.

of Kole's injuries (for which every legal system would provide tort compensation) to the mental distress of some stranger who reads about Kole's death in the paper (for which no legal system would provide tort compensation). It cannot seriously be maintained that Article 17 uses the term in this broadest sense, thus exploding tort liability beyond what any legal system in the world allows, to the farthest reaches of what could be denominated "harm." We therefore reject petitioners' initial proposal that we simply look to English dictionary definitions of "damage" and apply that term's "plain meaning." Brief for Petitioners 7–9.

There are only two thinkable alternatives to that. First, what petitioners ultimately suggest: that *"dommage"* means what French law, in 1929, recognized as *legally cognizable* harm, which petitioners assert included not only *"dommage matériel"* (pecuniary harm of various sorts) but also *"dommage moral"* (nonpecuniary harm of various sorts, including loss of society). In support of that approach, petitioners point out that in a prior case involving Article 17 we were guided by French legal usage: *Air France* v. *Saks*, 470 U. S. 392 (1985) (interpreting the term *"accident"*). See also *Eastern Airlines, Inc.* v. *Floyd*, 499 U. S. 530 (1991) (interpreting the Article 17 term *"lésion corporelle"*). What is at issue here, however, is not simply whether we will be guided by French legal usage *vel non*. Because, as earlier discussed, the dictionary meaning of the term *"dommage"* embraces harms that no legal system would compensate, it must be acknowledged that the term is to be understood in its distinctively *legal* sense—that is, to mean only *legally cognizable harm*. The nicer question, and the critical one here, is whether the word *"dommage"* establishes *as the content of the concept "legally cognizable harm"* what French law accepted as such in 1929. No case of ours provides precedent for the adoption of French law in such detail. In *Floyd*, we looked to French law to determine whether *"lésion corporelle"* indeed meant (as it had been translated)

"bodily injury"—not to determine the subsequent question (equivalent to the question at issue here) whether "bodily injury" encompassed psychic injury. See *id.*, at 536–540. And in *Saks*, once we had determined that in French legal terminology the word *"accident"* referred to an unforeseen event, we did not further inquire whether French courts would consider the event at issue in the case unforeseen; we made that judgment for ourselves. See 470 U. S., at 405–407.

It is particularly implausible that "the shared expectations of the contracting parties," *id.*, at 399, were that their mere use of the French language would effect adoption of the precise rule applied in France as to what constitutes legally cognizable harm. Those involved in the negotiation and adoption of the Convention could not have been ignorant of the fact that the law on this point varies widely from jurisdiction to jurisdiction, and even from statute to statute within a single jurisdiction. Just as we found it "unlikely" in *Floyd* that Convention signatories would have understood the general term *"lésion corporelle"* to confer a cause of action available under French law but unrecognized in many other nations, see 499 U. S., at 540, so also in the present case we find it unlikely that they would have understood Article 17's use of the general term *"dommage"* to require compensation for elements of harm recognized in France but unrecognized elsewhere, or to forbid compensation for elements of harm *unrecognized* in France but recognized elsewhere. Many signatory nations, including Czechoslovakia, Denmark, Germany, the Netherlands, the Soviet Union, and Sweden, did not, even many years after the Warsaw Convention, recognize a cause of action for nonpecuniary harm resulting from wrongful death. See 11 International Encyclopedia of Comparative Law: Torts, ch. 9, pp. 15–18 (A. Tunc ed. 1972); *Floyd, supra,* at 544–545, n. 10.

The other alternative, and the only one we think realistic, is to believe that *"dommage"* means (as it does in French

legal usage) "legally cognizable harm," but that Article 17 leaves it to adjudicating courts to specify what harm is cognizable. That is not an unusual disposition. Even within our domestic law, many statutes that provide generally for "damages," or for reimbursement of "injury," leave it to the courts to decide what sorts of harms are compensable. See, e. g., *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, 32 (1990) (Jones Act, 46 U. S. C. App. § 688 (1988 ed.), which provides "action for damages" to "[a]ny seaman who shall suffer personal injury," permits compensation only for pecuniary loss); *Michigan Central R. Co.* v. *Vreeland*, 227 U. S. 59, 71 (1913) (Employers' Liability Act of Apr. 22, 1908, which makes employer "liable in damages . . . for . . . injury or death," permits compensation only for pecuniary loss); *Broan Mfg.* v. *Associated Distributors, Inc.*, 923 F. 2d 1232, 1235–1236 (CA6 1991) (Lanham Trade-Mark Act, 15 U. S. C. § 1117(a), which provides for recovery of "any damages sustained," permits compensation for future lost profits); *Phelps* v. *White*, 645 So. 2d 698, 703 (La. Ct. App. 3d Cir. 1994) (specifying elements of compensation allowable under La. Civ. Code Ann. § 2315.2 (West Supp. 1995), providing for recovery of "damages . . . sustained as a result" of wrongful death); *Department of Ed.* v. *Blevins*, 707 S. W. 2d 782, 783 (Ky. 1986) (Kentucky Rev. Stat. Ann. § 411.130 (Michie 1992), which provides that "damages may be recovered" for wrongful death, does not permit compensation for emotional distress).

That this is the proper interpretation is confirmed by another provision of the Convention. Article 17 is expressly limited by Article 24, which as translated provides:

"(1) In the cases covered by articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.

"(2) In the cases covered by article 17 the provisions of the preceding paragraph shall also apply, *without prejudice to the questions as to who are the persons who have*

*the right to bring suit and what are their respective rights.*"   49 Stat. 3020 (emphasis added).[3]

The most natural reading of this Article is that, in an action brought under Article 17, the law of the Convention does not affect the substantive questions of who may bring suit and what they may be compensated for.   Those questions are to be answered by the domestic law selected by the courts of the contracting states.   Petitioners contend that, because Article 24 refers to the parties' *"respective* rights," this provision defers to domestic law only on the "procedural" issues of who has standing to sue and how the proceeds of a damages award under Article 17 should be divided among eligible claimants.   It does not seem to us that the question of who is entitled to a damages award is procedural; and in any event limiting Article 24 to procedural issues would render it superfluous, since Article 28(2) provides that "[q]uestions of procedure shall be governed by the law of the court to which the case is submitted."   49 Stat. 3021.   More importantly, petitioners' reading of Article 24(2) would produce a strange regime in which 1929 French law (embodied in the Convention) determines what harms arising out of international air accidents must be indemnified, while current domestic law determines who is entitled to the indemnity and how it is to be divided among claimants.   When presented with an equally plausible reading of Article 24 that leads to a more comprehensible result—that the Convention left to domestic law the questions of who may recover and what compensatory damages are available to them—we decline to

---

[3] The governing French text of Article 24 provides:

"(1) Dans les cas prévus aux articles 18 et 19 toute action en responsabilité, à quelque titre que ce soit, ne peut être exercée que dans les conditions et limites prévues par la présente Convention.

"(2) Dans les cas prévus à l'article 17, s'appliquent également les dispositions de l'alinéa précédent, sans préjudice de la détermination des personnes qui ont le droit d'agir et de leurs droits respectifs."   49 Stat. 3006.

embrace a reading that would produce the mélange of French and domestic law proposed by petitioners.

Because a treaty ratified by the United States is not only the law of this land, see U. S. Const., Art. II, § 2, but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history *(travaux préparatoires)* and the postratification understanding of the contracting parties. Both of these sources confirm that the compensable injury is to be determined by domestic law. In the drafting history, the only statements we know of that directly discuss the point were made by the Comité International Technique d'Experts Juridiques Aériens (CITEJA), which did the preparatory work for the two Conferences (1925 in Paris, 1929 in Warsaw) that produced the Warsaw Convention. In its report of May 15, 1928, the Committee stated:

> "It was asked whether it would not be possible, in this respect, to determine the category of damages subject to reparations.
>
> "Although this question seemed very interesting, it was not possible to find a satisfactory solution before knowing exactly the legislation of the various countries. It was understood that the question would be studied later on, when the issue of knowing which are the persons, who according to the various national laws, have the right to take action against the carrier, will have been elucidated." Report of the Third Session of CITEJA by Henry de Vos, reprinted in International Technical Committee of Legal Experts on Air Questions 106 (May 1928).

To the same effect is the following passage from the CITEJA Report accompanying the 1929 draft:

> "The question was asked of knowing if one could determine who the persons upon whom the action devolves in the case of death are, and what are the damages sub-

ject to reparation.   It was not possible to find a satisfactory solution to this double problem, and the CITEJA esteemed that this question of private international law should be regulated independantly *[sic]* from the present Convention." Report of the Third Session of CITEJA by Henry de Vos (Sept. 25, 1928), reprinted in Second International Conference on Private Aeronautical Law Minutes, Warsaw 1929, p. 255 (R. Horner & D. Legrez transl. 1975).

Both these statements make clear that the questions of who may recover, and what compensatory damages they may receive, were regarded as intertwined; and that both were unresolved by the Convention and left to "private international law"—*i. e.,* to the area of jurisprudence we call "conflict of laws," dealing with the application of varying domestic laws to disputes that have an interstate or international component.

We are unpersuaded by petitioners' reliance on the comment of French delegate Georges Ripert, asserting, as one basis for rejecting application of domestic law to the issue of carriers' vicarious liability, that it would be "the first time that application of national law is required." *Id.,* at 66. Reply Brief for Petitioners 2–3.   Not only does this remark not have the authority of submissions by the drafting committee, but it is a generalization rather than a statement focused specifically upon the issue here: what law governs the "category of damages subject to reparations."   And the generalization is demonstrably wrong to boot, since it is incontrovertible that Article 24 of the Convention requires the application of national law to *some* issues.

The postratification conduct of the contracting parties displays the same understanding that the damages recoverable—so long as they consist of compensation for harm incurred *(dommage survenu)*—are to be determined by domestic law.   Some countries, including England, Germany and the Netherlands, have adopted domestic legislation to

govern the types of damages recoverable in a Convention case. See Haanappel, The right to sue in death cases under the Warsaw Convention, 6 Air Law 66, 72, 74 (1981); E. Giemulla, R. Schmid, & P. Ehlers, Warsaw Convention 39, n. 5 (1992); German Law Concerning Air Navigation (Luft VG) of Jan. 10, 1959, Arts. 35–36, 38, reprinted in 1 Senate Committee on Commerce, Air Laws and Treaties of the World, 89th Cong., 1st Sess., 766–768 (Comm. Print 1965); R. Mankiewicz, The Liability Regime of the International Air Carrier ¶ 187, pp. 160–161 (1981). Canada has adopted legislation setting forth who may bring suit under Article 24(2), but has left the question of what types of damages are recoverable to provincial law. Haanappel, *supra*, at 70–71. The Court of Appeals of Quebec has rejected the argument that Article 17 permits damages unrecoverable under domestic Quebec law. *Dame Surprenant* v. *Air Canada*, [1973] C. A. 107, 117–118, 126–127 (opinion of Deschênes, J.). But see *Preston* v. *Hunting Air Transport Ltd.*, [1956] 1 Q. B. 454, 461–462 (granting damages under Convention, but without considering Article 24). Finally, the expert commentators are virtually unanimous that the type of harm compensable is to be determined by domestic law. See, *e. g.*, H. Drion, Limitation of Liabilities in International Air Law ¶ 111, pp. 125–126 (1954); Giemulla, Schmid, & Ehlers, *supra*, at 33; D. Goedhuis, National Airlegislations and the Warsaw Convention 269 (1937); Mankiewicz, *supra*, ¶ 187, at 160–161; G. Miller, Liability in International Air Transport: The Warsaw System in Municipal Courts 125 (1977); see also Cha, The Air Carrier's Liability to Passengers in International Law, 7 Air L. Rev. 25, 56–57 (1936).

## III

Having concluded that compensable harm is to be determined by domestic law, the next question to which we would logically turn is that of *which sovereign's* domestic law. That is the "private international law" issue alluded to in the last-quoted excerpt from the CITEJA Report. Choice of

law is, of course, determined by the forum jurisdiction, see E. Scoles & P. Hay, Conflict of Laws § 3.56 (1982), and would normally be a question confronting us here. We have been spared that inquiry, however, because both parties agree that if the issue of compensable harm is (as we have determined) unresolved by the Convention itself, it is governed in the present case by the law of the United States.

That leaves a final question unresolved: Which particular law of the United States provides the governing rule? The Second Circuit, moved by the need to "maintain a uniform law under the Warsaw Convention," held that general maritime law governs causes of action under the Convention, whether the accident out of which they arise occurs on land or on the high seas. 43 F. 3d, at 21–22. We think not. As we have discussed, the Convention itself contains no rule of law governing the present question; nor does it empower us to develop some common-law rule—under cover of general admiralty law or otherwise—that will supersede the normal federal disposition. Congress may choose to enact special provisions applicable to Warsaw Convention cases, as some countries have done. See *supra*, at 227–228. Absent such legislation, however, Articles 17 and 24(2) provide nothing more than a pass-through, authorizing us to apply the law that would govern in absence of the Warsaw Convention. There is little doubt what that law is in this case.

Section 761 of DOHSA provides:

> "Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would

have been liable if death had not ensued." 46 U. S. C. App. § 761 (1988 ed.).

The death that occurred here falls within the literal terms of this provision, and it is well established that those literal terms apply to airplane crashes. See *Executive Jet Aviation, Inc.* v. *Cleveland,* 409 U. S. 249, 263–264 (1972). Section 762 of DOHSA provides that the recovery in a suit under § 761 "shall be a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought." 46 U. S. C. App. § 762. Thus, petitioners cannot recover loss-of-society damages under DOHSA. Moreover, where DOHSA applies, neither state law, see *Offshore Logistics, Inc.* v. *Tallentire,* 477 U. S. 207, 232–233 (1986), nor general maritime law, see *Mobil Oil Corp.* v. *Higginbotham,* 436 U. S. 618, 625–626 (1978), can provide a basis for recovery of loss-of-society damages.[4]

Petitioners argue that DOHSA should not apply to this cause of action because of the concern expressed by the Second Circuit: that "a uniform law should govern Warsaw Convention cases." 43 F. 3d, at 21. They urge that, if we must look to domestic law, we should craft a federal rule of damages that will be applicable in all suits brought under the Convention. Undoubtedly it was a primary function of the Warsaw Convention to foster uniformity in the law of international air travel, see *Floyd,* 499 U. S., at 552, but as our discussion above has made clear, this is not an area in which the imposition of uniformity was found feasible. See *supra,* at 226–227. The Convention neither adopted any uniform

---

[4] We need not consider whether § 761 of DOHSA calls into question the District Court's determination that the decedent's mother is a proper party to this suit, or its grant of a jury trial, see *Romero* v. *International Terminal Operating Co.,* 358 U. S. 354, 371, n. 28 (1959), and whether § 762 contradicts the District Court's allowance of pain and suffering damages, see *Offshore Logistics, Inc.,* 477 U. S., at 215, n. 1. KAL challenged none of these rulings in its petition for certiorari.

rule of its own nor authorized national courts to pursue uniformity in derogation of otherwise applicable law. Petitioners argue, in effect, that the Convention contains an implicit authorization for national courts to create uniformity between overland and oversea accidents governed by their respective domestic laws, even though it leaves the vast discrepancies among the various domestic laws untouched. That is most unlikely.

Finally, petitioners contend that DOHSA cannot supply the substantive law of damages, because this would result in an unintended "double cap." They argue that the Warsaw Convention's $75,000 per passenger limit on liability (except in cases of willful misconduct), when combined with a DOHSA rule prohibiting compensation for nonpecuniary harm, will not sufficiently deter willful misconduct. We are unpersuaded. The Convention unquestionably envisions the application of domestic law; it is the function of Congress, and not of this Court, to decide that domestic law, alone or in combination with the Convention, provides inadequate deterrence.

\* \* \*

We conclude that Articles 17 and 24(2) of the Warsaw Convention permit compensation only for legally cognizable harm, but leave the specification of what harm is legally cognizable to the domestic law applicable under the forum's choice-of-law rules. Where, as here, an airplane crash occurs on the high seas, DOHSA supplies the substantive United States law. Because DOHSA permits only pecuniary damages, petitioners are not entitled to recover for loss of society. We therefore need not reach the question whether, under general maritime law, dependency is a prerequisite for loss-of-society damages.

Accordingly, that portion of the Second Circuit judgment permitting Zicherman to recover loss-of-society damages if she can establish her dependency on the decedent is re-

versed, and that portion of the judgment vacating the award of loss-of-society damages to Mahalek is affirmed.

*It is so ordered.*