Charles FRIEDMAN and Shirley
Friedman, Plaintiffs,

v.

CUNARD LINE LIMITED, a New York
corporation; and Golden Door, Inc. a
California corporation, d/b/a Golden
Door Spa at Sea, Defendants.

No. 95 Civ. 5232(CSH).

United States District Court,
S.D. New York.

March 9, 1998.

Meyner and Landis, Newark, NJ (William J. Fiore, of counsel), for Plaintiffs.

Kirlin, Campbell & Keating New York City (Pamela L. Milgrim, of counsel), for Defendant, Cunard Line Ltd.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This case presents the question whether a nondependent spouse of a cruise ship passenger injured on the high seas may recover nonpecuniary damages for loss of society and consortium in federal court.

## I

Plaintiffs Charles and Shirley Friedman are husband and wife. They reside in New Jersey. In August 1994 plaintiffs were passengers on the cruise ship SEA GODDESS II, owned and operated by defendant Cunard Line Limited ("Cunard"). The cruise was between Mediterranean Sea ports. The vessel did not call at any American port.

Shirley Friedman retired from her occupation in 1988. Charles Friedman retired in 1993. They were both 73 years old at the time of the accident in suit.

On August 4, 1994, Shirley Friedman was injured when she fell while participating in an aerobics class being conducted in the vessel's main salon for the benefit and entertainment of the passengers. At the time of the accident the SEA GODDESS II was anchored on the high seas off the Greek island of Skiathos.

An employee of Golden Door, Inc., a health center operator under contract to Cunard, was conducting the aerobics class. Plaintiffs commenced this action against Cunard and Golden Door. In an opinion dated November 5, 1997, familiarity with which is assumed, the Court granted Golden Door's motion to dismiss the complaint as to it or lack of personal jurisdiction, and denied Cunard's motion for summary judgment on the issue of liability.

The case is now before the Court on Cunard's motion for partial summary judgment dismissing Charles Friedman's claims for loss of society and consortium damages. Shirley Friedman's claims for her injuries are not implicated by this motion. Cunard contends that Charles Friedman's nonpecuniary claims are not recoverable under the governing general maritime law as declared by federal courts.

## II

The threshold question is whether American general maritime law governs the case, as Cunard claims. Plaintiffs say it does not because diversity of citizenship is the only basis for subject matter jurisdiction they pleaded in their complaint. When a federal court's subject matter jurisdiction depends solely upon diversity, the court follows the choice-of-law rules of the state in which it sits. Plaintiffs reason that this would lead to the application of either New York or New Jersey substantive law, which would support Charles Friedman's "claim for loss of society and consortium." Brief at 5.[1]

I cannot accept that reasoning. Plaintiffs' pleading cannot control the question of subject matter jurisdiction. The existence *vel non* of admiralty jurisdiction in tort depends upon the circumstances of the incident, and controls the governing law. "With admiralty jurisdiction comes the application of substantive admiralty law. Absent a relevant statute, the general maritime law, as developed by the judiciary, applies. Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *East River Steamship Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 864–65, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

Where a tort falls within admiralty jurisdiction, the general maritime law applies, even if the plaintiff's complaint pleaded diversity of citizenship as the sole basis for subject matter jurisdiction. That is the holding of *Wahlstrom v. Kawasaki Heavy Industries, Ltd.,* 4 F.3d 1084 (2d Cir.1993), *cert. denied,* 510 U.S. 1114, 114 S.Ct. 1060, 127 L.Ed.2d 380 (1994), a wrongful death case arising out of a collision between vessels on a navigable waterway within Connecticut territorial waters. Although in their complaint

---

**1.** Plaintiff Charles Friedman uses the words "society" and "consortium" synonymously, which in the marital context is appropriate. "The term 'society' embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection." *Sea–Land Services. Inc. v. Gaudet,* 414 U.S. 573, 585, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). The legal concept of "loss of consortium, which incorporates loss of society," permits a wife to recover damages under that heading resulting "from personal injury to her husband," or in this case, recovery by a husband for loss of consortium with his wife. *Air Disaster at Lockerbie, Scotland,* 37 F.3d 804, 829–30 (2d Cir.1994).

plaintiffs, the parents of the decedent, based federal jurisdiction solely upon diversity of citizenship and sought damages pursuant to Connecticut law, the Second Circuit observed that a collision between vessels on navigable waters "comes within the admiralty jurisdiction of the federal courts," and that "[w]ith this jurisdiction comes the application of substantive maritime law, and absent a relevant federal statute, we apply the maritime law as developed by the courts." The Second Circuit proceeded to apply the general maritime law to the claims asserted in *Wahlstrom*, in derogation of Connecticut law. *See also Carey v. Bahama Cruise Lines*, 864 F.2d 201, 206 (1st Cir.1988) (in suit for injury suffered by cruise ship passengers, "[t]he mere fact that the plaintiffs invoked the diversity of citizenship jurisdiction of the district court does not preclude the application of maritime law.").

Seeking to avoid the general maritime law, plaintiffs at bar rely upon *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69 (3d Cir.1996). Plaintiff, a passenger on a cruise ship, slipped and fell while taking a shower in the bathtub in her cabin. She sued the shipowner for negligence, on the theory that there were insufficient abrasive strips on the floor of the tub to prevent her from slipping. Plaintiff, "neither [pleading] nor otherwise [invoking] the admiralty jurisdiction of the district court," filed her original complaint in a New Jersey state court; the shipowner "removed the case to federal district court on the basis of diversity jurisdiction." 82 F.3d at 73. Plaintiff did not amend her complaint to invoke admiralty jurisdiction. "The district court entered a pretrial order without objection from the parties stating that the jurisdictional predicate was diversity of citizenship," and "the parties agreed at oral argument [of defendant's motion for summary judgment] they are satisfied with the application of New Jersey state law. It is New Jersey law that we will apply." *Id.*

In other words, the Third Circuit regarded the plaintiffs as "the master of her complaint," 82 F.3d at 73, and allowed her to avoid the general maritime law, even though "[a]dmiralty jurisdiction apparently exists since the injury occurred on navigable wa-

ters, and the incident has a nexus to traditional maritime activity." *Id.* (internal quotation marks and citations omitted).

■ I think it is a doubtful proposition that parties, who cannot by their agreement vest a federal district court with subject matter jurisdiction that does not exist, can agree to divest the court of jurisdiction that unquestionably exists. If that is the Third Circuit's view, I am not bound by it. In any event, *Fedorczyk* is distinguishable on the facts from the case at bar, since unlike the compliant shipowner in that case, the defendant at bar pleaded in its answer that the general maritime law governed the parties' rights and obligations.

### III

■ While a plaintiff may not be allowed to draft his pleading so as to oust the district court of admiralty jurisdiction otherwise present, it does not follow from that general proposition that the particular case falls within that jurisdiction. Accordingly it is necessary to consider whether the tort plaintiffs allege is "maritime" in nature.

■ Determination of the question whether "a tort is 'maritime' and thus within the admiralty jurisdiction of the federal courts has traditionally depended upon the locality of the wrong. If the wrong occurred on navigable waters, the action is within admiralty jurisdiction; if the wrong occurred on land, it is not." *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 253, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). However, during more recent years, at least in respect of torts occurring on navigable waters within the United States, the Supreme Court has imposed an additional requirement "that the wrong must bear a significant relationship to traditional maritime activity." *East River Steamship Corp.*, 476 U.S. at 864 (internal quotation marks omitted). The Supreme Court characterizes that requirement as one of a "maritime nexus," *Id.;* the Second Circuit has used the words "situs" and "status" to characterize these two jurisdictional requirements. *See Keene Corp. v. United States*, 700 F.2d 836, 843 (2d Cir.1983) ("Admiralty jurisdiction in tort exists when the

wrong (1) took place on navigable waters ("situs") and (2) bear[s] a significant relationship to traditional maritime activity ("status"))."

In *Executive Jet* the Court declined to find the requisite maritime nexus in a case where a jet aircraft crash-landed and sank in the navigable waters of Lake Erie shortly after takeoff from a Cleveland airport. In *Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), the Court made it clear that the maritime nexus requirement articulated in *Executive Jet* was not limited to aviation tort cases; but *Foremost Insurance* found a sufficiently significant relationship to traditional maritime activity in a collision between two small pleasure boats on a river in Louisiana, notwithstanding the fact that neither boat was being used for commercial purposes. The Court explained:

> In light of the need for uniform rules governing navigation, the potential impact on maritime commerce when two vessels collide on navigable waters, and the uncertainty and confusion that would necessarily accompany a jurisdictional test tied to the commercial use of a given boat, we hold that a complaint alleging a collision between two vessels on navigable waters properly states a claim within the admiralty jurisdiction of the federal courts.

457 U.S. at 677.

In *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), the Court sustained admiralty jurisdiction in a case where a pleasure yacht caught fire while docked at a Lake Michigan marina, destroying the yacht and damaging several neighboring vessels and the marina. In considering whether the boat owner, seeking to invoke maritime jurisdiction, had shown "a substantial relationship between the activity giving rise to the incident and traditional maritime activity," the Court concluded that "the relevant activity was the storage and maintenance of the vessel at a marina on navigable waters." 497 U.S. at 364–65 (footnote omitted).

It will be noted that *Executive Jet, Foremost Insurance,* and *Sisson v. Ruby* all involved accidents occurring on waters that were both navigable and within state territorial boundaries. In contrast, the injuries suffered by plaintiff Sheila Friedman occurred on board a vessel on the high seas. I think the distinction is a vital one, in view of what the Supreme Court said in *East River Steamship Corp.*, 476 U.S. at 864:

> When torts have occurred on navigable waters within the United States, the court has imposed an additional requirement of a "maritime nexus"—that the wrong must bear "a significant relationship to traditional maritime activity." *See Executive Jet Aviation, Inc. v. Cleveland,* 409 U.S. 249, 268, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). We need not reach the question whether a maritime nexus also must be established when a tort occurs on the high seas. Were there such a requirement, it clearly was met here, for these ships were engaged in maritime commerce, a primary concern of admiralty law.

In *East River Steamship Corp.*, the Court sustained admiralty jurisdiction over a tort claim that arose when injuries were inflicted upon ships' turbines "while the ships were sailing on the high seas." *Id.*

■ That analysis would appear to apply to a cruise ship engaged in carrying passengers for hire on the high seas for purposes of entertainment and relaxation. Opulent cruise ships have been part of the world's maritime tradition at least since the launching of Cleopatra's barge. Accordingly, even assuming that a maritime nexus is necessary to establish admiralty jurisdiction over a tort committed on the high seas (a question the Supreme Court left open in *East River Steamship Corp.* and does not appear to have subsequently addressed), that nexus is established by the role that ocean-going cruise ships play in maritime commerce.

Not surprisingly, the Second Circuit has routinely regarded suits for injuries by cruise ship passengers as falling within admiralty jurisdiction. *See, e.g., Monteleone v. Bahama Cruise Line, Inc.,* 838 F.2d 63 (2d Cir. 1988); *Rainey v. Paquet Cruises, Inc.,* 709

F.2d 169 (2d Cir.1983).[2] Consequently, as the cited cases reflect, the Second Circuit traditionally applies the general maritime law to injuries suffered by passengers on cruise ships. Other circuits are in accord. *See Carey v. Bahama Cruise Lines*, 864 F.2d 201, 206 (1st Cir.1988) (injuries suffered by passenger when using a gangway to move between the vessel and a tender constituted a maritime tort requiring the application of substantive maritime law); *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1402–03 (9th Cir.1994) (injuries suffered when raft ferrying cruise passengers from vessel to coral atoll capsized constituted a maritime tort falling within admiralty jurisdiction and subject to general maritime law).

In *Carey*, the First Circuit, followed by the Ninth Circuit in *Chan*, articulated limitations on a perceived maritime nexus requirement to sustain admiralty jurisdiction. *Carey* says at 864 F.2d 201 n. 4:

> [T]his tort has a significant relationship to maritime activity. We believe an injury to a cruise ship passenger caused by a sliding gangway that connected the cruise ship to a tender is a uniquely maritime injury. There should be a uniform maritime rule specifying the respective responsibilities of crew members and passengers in such situations.

In *Chan* the Ninth Circuit cited that footnote from *Carey* in concluding that the activity resulting in the injuries in suit "bears a substantial relationship to traditional maritime activity," going on to observe: "An injury to a cruise ship passenger or guest caused by the capsizing of a boat or raft is a uniquely maritime injury."

■ I do not think that the particular injury-producing activity occurring on board a cruise ship on the high seas must be "uniquely maritime" in order to sustain admi-

ralty jurisdiction. I read *East River Steamship Corp.*, 476 U.S. at 864, as holding that if a tort occurring on the high seas requires an additional maritime nexus at all, that nexus is established by the vessel's being engaged in "maritime commerce," a commerce in which ocean-going cruise ships are unquestionably engaged. The property damage sued on in the admiralty in *East River Steamship Corp.* resulted from the installation in vessels of turbines which malfunctioned due to design and manufacturing defects. There is nothing uniquely maritime about an improperly designed and manufactured turbine failing; such incidents occur on land as well.

Nor is there anything uniquely maritime about the injury-producing conduct resulting in the Second Circuit cruise ship passenger cases of *Monteleone* and *Rainey*. In *Monteleone*, the passenger fell down a flight of stairs on the vessel; her theory of liability was that she tripped over a protruding screw holding a brass strip to the edge of a step. 838 F.2d at 64. In *Rainey*, the passenger tripped over a stool while dancing in the ship's discotheque. 709 F.2d at 169. Similarly, in *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69 (3d Cir.1996), upon which plaintiffs at bar rely in a different context, the Third Circuit found a sufficient nexus to "traditional maritime activity" when a passenger slipped and fell onto the floor of the tub in her cabin, thereafter alleging that the tub was not equipped with sufficient anti-slip abrasive strips. 82 F.3d at 72–73.

One cannot imagine three more prosaic (albeit no doubt painful) injuries than these. There is nothing "uniquely maritime" about tripping on the stairs or over a stool, or falling in a bathtub. Indeed, in *Rainey* the court of appeals specifically noted that plaintiff's inquiries "did not result from the type of occurrence usually associated with a ship

---

**2.** In *Monteleone*, the Second Circuit noted that the district court "exercis[ed] jurisdiction in admiralty" under 46 App.U.S.C. § 740. 838 F.2d at 64. That statute extends admiralty jurisdiction to cases of damage or injury "caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." The applicability of that statute to the accident is not clear, since the plaintiff fell down a flight of stairs on board defendant's cruise ship, and the district judge's opinion following trial, reported at 664 F.Supp. 744 (S.D.N.Y.1987), does not explain his invocation of this admiralty jurisdiction extension statute. In *Rainey*, the Second Circuit's opinion does not recite the jurisdictional predicate, and the district court's opinion is not reported, but the district court conducted a bench trial, which is consistent with admiralty practice.

at sea." 709 F.2d at 170. But that distinction is germane only to the standard of care a shipowner owes its passengers, *id.* at 171; admiralty jurisdiction obtains in either event. What sustains admiralty jurisdiction in these cases, as the Supreme Court noted in *East River Steamship Corp.,* is that the torts occurred on the high seas on board vessels engaged in maritime commerce.

Therefore I conclude that, in the case at bar, plaintiffs' claims, including the claim of plaintiff Charles Friedman for loss of society and consortium, fall within admiralty jurisdiction and are governed by the general maritime law.

## IV

The next question is whether the general maritime law furnishes Charles Friedman with the remedy of a claim for loss of society and consortium.

Under American statutory and case law, the availability of particular remedies for maritime torts depends upon a number of factors. Did the defendant's wrong cause death, or only injury? Did the accident occur on the high seas or in the territorial waters of a state? What was the victims' status: a seaman, a longshoreman, or someone else, such as a passenger?

Where death occurs on the high seas, there can be no claim for loss of society under the general maritime law. The Death on the High Seas Act ("DOHSA"), 46 App. U.S.C. §§ 761–768, enacted in 1920, creates a cause of action for wrongful death but limits recovery to pecuniary loss, thereby precluding recovery for nonpecuniary loss of society damages under any other legal theory. *See Zicherman v. Korean Air Lines Co., Ltd.,* 516 U.S. 217, 116 S.Ct. 629, 636, 133 L.Ed.2d 596 (1996) ("[W]here DOHSA applies, neither state law, not general maritime law, can provide a basis for loss-of-society damages.") (citations and footnote omitted).

The Jones Act, 46 App.U.S.C. § 688, also enacted in 1920, provides an action in negligence for the death or injury of a seaman during the course of his employment, whether the incident occurs on the high seas or in territorial waters. However, as we shall see, that statute also limits its remedies to pecuniary loss.

In *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 409, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), a case involving the death of a longshoreman in territorial waters, the Supreme Court overruled its earlier decision in *The Harrisburg,* 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), and held that "an action does lie under general maritime law for death caused by violation of maritime duties." In *Moragne* the Court created a wrongful death action for the survivors of longshoremen that had not previously existed under federal law, since they are not "seamen" for Jones Act purposes, and it is inherent in the nature of what longshoremen do (loading and unloading ships in port) that accidents do not befall them on the high seas. The *Moragne* Court ascribed its holding to the desirability of a uniform maritime law:

> Our recognition of a right to recover for wrongful death under general maritime law will assure uniform vindication of federal policies, removing the tensions and discrepancies that have resulted from the necessity to accommodate state remedial statutes to exclusively maritime substantive concepts. *E.g., Hess v. United States,* 361 U.S. 314 [80 S.Ct. 341, 4 L.Ed.2d 305] (1960); *Goett v. Union Carbide Corp.,* 361 U.S. 340 [80 S.Ct. 357, 4 L.Ed.2d 341] (1960). Such uniformity not only will further the concerns of [DOHSA and the Jones Act] but also will give effect to the constitutionally based principle that federal admiralty law should be a "system of law coextensive with, and operating uniformly in, the whole country." *The Lottawanna,* [88 U.S. 558] 21 Wal. 558, 575 [22 L.Ed. 654] (1874).

*Id.* at 401–02.

*Moragne* did not discuss the damages recoverable in a wrongful death action arising from the death of a longshoreman in territorial waters. The Court reached that issue in *Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 583–591, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), which held that the general maritime law wrongful-death remedy declared in *Mo-*

*ragne* included a claim by the longshoreman's widow for loss of society.

In *American Export Lines, Inc. v. Alvez,* 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980), the Court extended the right of a longshoreman's wife to claim loss of society to cases of injury, reasoning that "[t]o be sure, *Gaudet* upheld a claim for loss of society in the context of a wrongful-death action. But general federal maritime law is a source of relief for a longshoreman's personal injury, just as it is a source of remedy for wrongful death. Within this single body of judge-formulated law, there is no apparent reason to differentiate between fatal and nonfatal injuries in authorizing the recovery of damages for loss of society." *Id.* at 281.

In *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), a wrongful death case arising out of the crash of a helicopter outside Louisiana's territorial waters, the Court held that DOHSA limited the measure of damages to pecuniary loss, so that the survivors could not assert a general maritime claim for loss of society. *Higginbotham* presaged the Court's later decision in *Zicherman, supra.*

The Supreme Court returned to seamen in *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990), which arose out of the death of a seaman in territorial waters. The Court held that neither the Jones Act nor the general maritime law gave the seaman's widow a claim for loss of society. It was argued that *Gaudet* gave such a remedy to a longshoreman's widow, but the *Miles* Court brushed *Gaudet* aside: "The holding of *Gaudet* applies only in territorial waters, and it applies only to longshoremen." 498 U.S. at 31. In denying a claim for loss of society on the facts presented in *Miles,* the Court described itself as striving for uniformity in the law:

> Our decision also remedies an anomaly we crated in *Higginbotham.* Respondents in that case warned that the elimination of loss of society damages for wrongful deaths on the high seas would create an unwarranted inconsistency between deaths in territorial waters, where loss of society was available under *Gaudet,* and deaths on the high seas. We recognized the value of

uniformity, but concluded that a concern for consistency could not override the statute. *Higginbotham, supra,* at 624. Today we restore a uniform rule applicable to all actions for the wrongful death of a seaman, whether under DOHSA, the Jones Act, or general maritime law.

The last Supreme Court case I will consider is *Yamaha Motor Corp., U.S.A. v. Calhoun,* 516 U.S. 199, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996), upon which I asked counsel to comment in their briefs. In *Yamaha* a child was killed while jet skiing in territorial waters. Her parents, invoking both admiralty and diversity jurisdiction, asserted claims under state wrongful death and survival statutes. Defendant argued that the federal maritime wrongful death action the Court recognized in *Moragne* displaced all remedies afforded by state law. The Court's decision in *Yamaha* paints with a narrow brush; Justice Ginsburg wrote at 116 S.Ct. at 626 n. 8:

> We attempt no grand synthesis or reconciliation of our precedent today, but confine our inquiry to the question whether it was *Moragne's* design to terminate recourse to state remedies when non-seafarers meet death in territorial waters.

The Court allowed state law to govern damages in *Yamaha.* It recognized that "[p]ermissible state regulation ... must be consistent with federal maritime principles and policies," 116 S.Ct. at 628 n. 13, but noted that "Congress has not prescribed remedies for the wrongful death of nonseafarers in territorial waters," and that DOHSA, at 46 App.U.S.C. § 767, specifically preserves any applicable state wrongful death remedies. *Id.* at 628. In these circumstances, the Court concluded that "the damages available for the jet ski death of Natalie Calhoun are properly governed by state law." *Id.* at 629 (footnote omitted).

By now the reader may be wondering what these cases, dealing in large measure with death, seamen, and longshoremen, have to do with the claim of Charles Friedman for loss of society caused by a (fortunately) nonfatal injury to his wife, who was neither a seaman nor a longshoreman. These cases are instructive, I believe, because they demonstrate the Court's continuing concern with

uniformity in the maritime law: a concern which, while not constant, in certain peripheral areas, *see* Haight, *Babel Afloat: Some Reflections on Uniformity in Maritime Law*, 28 Journal of Maritime Law and Commerce 189, 195–202 (1997), nonetheless furnishes guidance in the sort of substantive issue presented by the case at bar.

A number of circuits have read *Miles v. Apex Marine Corp., supra*, as endorsing a uniform maritime law which rejects claims for nonpecuniary damages such as loss of services or consortium. In *Chan v. Society Expeditions, Inc.*, 39 F.3d at 1408, where a cruise passenger was injured on the high seas, the Ninth Circuit held that "loss of consortium and loss of society damages are not available in these circumstances under general maritime law," applying by analogy the Supreme Court's intent expressed in *Miles* to develop a "uniform rule applicable to all actions for the wrongful death of a seaman, whether under DOHSA, the Jones Act, or general maritime law." *Id.*, quoting *Miles*, 498 U.S. at 32. As noted, *Miles* rejected claims for loss of society in a seaman's death case; and the Ninth Circuit in *Chan* rejected claims for loss of society in a passenger's injury case, reasoning that to do otherwise "would effectively reward a tortfeasor for killing, rather than merely injuring his victim." *Id.* Courts of appeals have also found in *Miles* authority for denying loss of society claims for seamen injured on the high seas or in territorial waters. *See Smith v. Trinidad Corp.*, 992 F.2d 996 (9th Cir.) (per curiam); *Murray v. Anthony J. Bertucci Construction Co., Inc.*, 958 F.2d 127, 132 (5th Cir.), *cert. denied*, 506 U.S. 865, 113 S.Ct. 190, 121 L.Ed.2d 134 (1992) ("The Supreme Court's emphasis in *Miles* on the importance of uniformity in maritime death cases must apply equally to injury actions.... Therefore, we follow the Supreme Court's lead in *Miles* and hold that the spouse of an injured seaman has no cause of action for loss of society under the general maritime law.") (footnote omitted).

In *Wahlstrom*, 4 F.3d at 1091–93, the Second Circuit looked to *Miles* in holding that nondependant parents could not recover loss of society damages in a general maritime action following their child's death in territorial waters. The Second Circuit expressed its agreement "with the overwhelming majority of the pertinent federal decisions that nondependent parents cannot recover damages for loss of society in a general maritime action," *id.* at 1092, and added that "[i]t would hardly promote the uniform administration of admiralty actions for this circuit to adopt a rule in conflict with almost every other decided federal case on this issue," a policy of uniformity "emphasized and relied upon by the Court in *Miles*." *Id.* at 1092–93 (internal quotation marks and citation omitted).

In *In re Amtrak "Sunset Ltd." Train Crash*, 121 F.3d 1421 (11th Cir.1997), a tug and tow navigating a river in Alabama collided with and damaged a railroad bridge, with the result that a passenger train derailed and tumbled into the water, causing a number of deaths and injuries. The Eleventh Circuit decided *Amtrak* after the Supreme Court decided *Yamaha*, and said of *Yamaha*:

> Thus, it is evident in *Yamaha* that the Court, while intent on protecting the state interests that were present in that particular case (a product liability action resulting from a recreational boating accident in territorial waters) was not concerned with overruling bedrock admiralty principles recognized in *Southern Pacific Company v. Jensen*, 244 U.S. 205, 216, 37 S.Ct. 524, 529, 61 L.Ed. 1086 (1917), where the Court held that state law must yield if it "works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations." Indeed, since the birth of the *Jensen* doctrine in the early part of this century, the goals of uniformity and harmony in admiralty have survived to the present. *Yamaha*, by emphasizing these principles yet again, has affirmed their continuing vitality.

*Id.* at 1424–25. The Eleventh Circuit, applying the general maritime law, rejected claims for loss of society and loss of consortium. The court referred to its view, previously expressed in *Lollie v. Brown Marine Service, Inc.*, 995 F.2d 1565, 1565 (11th Cir.1993), that

"neither the Jones Act nor general maritime law authorizes recovery for loss of society or consortium in personal injury cases," *id.* at 1429, and concluded that nothing in *Yamaha* precluded application of that holding to the claims in *Amtrak*. It is worth noting that the train passengers in *Amtrak* were no more seamen than was Shirley Friedman, a passenger on defendant's cruise vessel, so there is no basis for distinguishing the Eleventh Circuit's conclusion regarding the general maritime law.

The considerations that arise from these cases militate against allowing Charles Friedman a state law claim for loss of society and consortium in the case at bar. There are two reasons.

First, such an entitlement would be disruptive of that uniformity in maritime law the Supreme Court regards as desirable. When one contemplates the size of the floating cities that operate as modern cruise vessels, it is easy enough to hypothesize at least one married couple from each of the fifty states of the Union embarking on the same cruise. If the vessel strands or is in collision, and one spouse or the other among all fifty married couples suffers serious injury, the shipowner will face claims for nonpecuniary damages based upon the laws of each of the fifty states. Such a result does unacceptable violence to uniformity in maritime law.

Second, assume that as the result of this hypothetical stranding or collision, members of the ship's crew are also injured. It would be anomalous to grant the families of passengers on board a cruise ship a form of damages which the law denies to the families of seamen on board the same ship at the same time and injured in the same accident, especially when, as noted in *Miles*, 498 U.S. at 36, "admiralty courts have always shown a special solicitude for the welfare of seamen and their families." The Second Circuit spoke directly to this point in *Wahlstrom*, 4 F.3d at 1092, as a basis for denying loss of society damages to parents: "In addition, in view of the special regard accorded by admiralty to seamen, it would be anomalous to expand the class of beneficiaries of nonseamen who may recover for the loss of society in the aftermath of the Supreme Court's denial of any

such recovery to the beneficiaries of seamen."

These hypothetical cases serve to illustrate the principles which I think govern the case at bar.

But plaintiffs at bar stress that in *In re Air Disaster at Lockerbie Scotland*, 37 F.3d 804, 829 (2d Cir.1994), *cert. denied*, 115 S.Ct. 934 (1995), the Second Circuit, after discussing DOSHA and the Jones Act, went on to say: "General maritime law cases that are not bound by statutory restriction, in contrast, allow recovery for loss of society." But when these words are examined in context, there is less to them than meets the eye.

The *Lockerbie* case arose out of the Pan American Flight 103 terrorist bombing, the aircraft having fallen to earth in Lockerbie, Scotland. In the case reported at 37 F.3d 804, the Second Circuit concluded that damages in a Warsaw Convention aircraft case were governed by federal common law principles, and that the compensability of damages for loss of society and companionship was to be determined "by an examination of maritime law." *Id.* at 828. The Second Circuit then applied that principle in *Zicherman v. Korean Air Lines Co., Ltd.*, 43 F.3d 18 (2d Cir.1994), *affirmed in part and reversed in part*, 116 S.Ct. 629 (1996), in which the aircraft crashed in the Sea of Japan.

The Supreme Court in *Zicherman* held that DOHSA governed that case and precluded nonpecuniary damages such as loss of society. That led the Second Circuit to reconsider the view it had expressed in *Lockerbie*; and, in *Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 9 (2d Cir. 1996), another case arising out of the Lockerbie crash, the Second Circuit concluded that the Supreme Court's decision in *Zicherman* "embodies an intervening change in controlling law because it requires application of ordinary choice of law principles to determine the proper substantive law governing damages, and because it expressly rejects our prior holding that the Warsaw Convention requires creation of a uniform rule governing damages." In those new circumstances, the Second Circuit looked to the substantive law of Ohio, the state of the decedent's and the plaintiff's domicile, which

allowed a claim for loss of society. *Id.* at 12–15.

Thus the Second Circuit's words in *Lockerbie* upon which plaintiff's at bar rely were spoken in the context of an aviation case, not a maritime case; and the Supreme Court explicitly disproved the result the Second Circuit deduced from that principle of maritime law. Accordingly these words lose some of their lustre. Of course, the Second Circuit said what it said; but its declaration falls well short of a holding that the general maritime law would provide a remedy for loss of society to the spouse of a cruise ship passenger injured on the high seas.

Attaching such a meaning to the Second Circuit's words in *Lockerbie* is particularly problematical when one considers the only cases the court of appeals cited as authority for the proposition. Those cases are *American Export Lines, Inc. v. Alvez, supra,* and *Sea Land Services, Inc. v. Gaudet, supra. See* 37 F.3d at 829. As has been noted, both cases involved the families of longshoremen; and the Supreme Court made it crystal clear in *Miles* that their holdings cannot be extended beyond that particular group of individuals.

■ In summary, I conclude that the general maritime law, which governs the case at bar, does not provide plaintiff Charles Friedman with a cause of action for loss of society and consortium caused by an injury occurring on the high seas.[3]

## V

As an alternative basis for decision, I reject Charles Friedman's claim because he cannot show that he was dependent upon Shirley Friedman, as the law defines that phrase.

■ I have noted the Second Circuit's holding in *Wahlstrom,* 4 F.3d at 1092, that "nondependent parents cannot recover damages for loss of society in a general maritime action." The Second Circuit, in adhering to that view, rejected the argument "that an essential pecuniary standard such as dependency should not provide the dividing line on this issue, given the nature of loss-of-society-damages." *Id.* In its subsequent opinion in *Zicherman,* 43 F.3d at 22, the Second Circuit cited *Wahlstrom* for the proposition that "[u]nder federal maritime law, the rule is well-established that only dependents may recover damages for loss of decedent's society," although the court of appeals acknowledged that "[n]o doubt this rule denies recovery to some deserving parties; nondependent survivors may feel the loss of a love one as keenly as dependent survivors."

As noted, the Supreme Court in *Zicherman* held that DOHSA furnished the governing law, thereby precluding recovery for loss of society. The Court added: "We therefore need not reach the question whether, under general maritime law, dependency is a prerequisite for loss-of-society damages." 116 S.Ct. at 637. But it is clear enough that that prerequisite exists under current Second Circuit authority.

■ The existence *vel non* of dependency turns upon pragmatic and economic considerations. "The test of dependency is the existence of a legal or voluntarily created status where the contributions are made for the purpose and have the result of maintaining or helping to maintain the dependent in [her] customary standard of living." *Zicherman,* 43 F.3d at 22 (internal quotation marks and citation omitted).

---

3. Plaintiffs cite three district court cases in other circuits upholding claims for loss of society or consortium in cases where death or injury occurred in territorial waters. *Powers v. Bayliner Marine Corp.,* 855 F.Supp. 199 (W.D.Mich.1994) (death); *Schumacher v. Cooper,* 850 F.Supp. 438 (D.S.C.1994) (injury); *Emery v. Rock Island Boatworks, Inc.,* 847 F.Supp. 114 (C.D.Ill.1994) (injury). These cases are distinguishable from the case at bar, where the injury occurred on the high seas, thereby eliminating any policy reason for applying the law of a particular state. Moreover, these cases are inconsistent with caselaw in this circuit delineating the breadth of the Supreme Court's decision in *Miles. Powers* acknowledges, 855 F.Supp. at 201, that its result is contrary to that reached in *Shield v. Bayliner Marine Corp.,* 822 F.Supp. 81, 83–84 (D.Conn. 1993) *Emery,* 847 F.Supp. at 118, criticizes *Shield* and the District of Connecticut's earlier decision in *Wahlstrom,* 800 F.Supp. 1061 (D.Conn.1992), on the ground that they "read the Supreme Court's holdings in *Miles* and *Higginbotham* too broadly," a criticism of no moment in this district, since the Second Circuit affirmed *Wahlstrom.*

■ The record makes it entirely clear that Charles Friedman has not shown dependency upon his wife in this economic sense of the word. Shirley Friedman had been retired since 1988. There is no showing that her husband was otherwise dependent upon her to maintain their standard of living.

While *Wahlstrom* and the cases its cites at 4 F.3d at 1091–92 deal with the claims of nondependent parents, I can perceive no principled distinction between nondependent parents and nondependent spouses, given the economic and pragmatic test of dependency articulated by the Second Circuit in *Zicherman*. Surely it is not a ground for distinction to say that the "society" of a spouse means more to one than the "society" of a child. It is not unknown, in the affairs of the human heart, that love for a child may last longer than love for a spouse.

For the foregoing reasons, the defendant's motion for partial summary judgment dismissing the claim of Charles Friedman for loss of society and consortium is granted.

It is SO ORDERED.