(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GE ENERGY POWER CONVERSION FRANCE SAS, CORP., FKA CONVERTEAM SAS *v.* OUTOKUMPU STAINLESS USA, LLC, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 18–1048. Argued January 21, 2020—Decided June 1, 2020

ThyssenKrupp Stainless USA, LLC, entered into three contracts with F. L. Industries, Inc., for the construction of cold rolling mills at ThyssenKrupp's steel manufacturing plant in Alabama. Each contract contained a clause requiring arbitration of any contract dispute. F. L. Industries then entered into a subcontractor agreement with petitioner (GE Energy) for the provision of nine motors to power the cold rolling mills. After the motors for the cold rolling mills allegedly failed, Outokumpu Stainless USA, LLC (which acquired ownership of the plant), and its insurers sued GE Energy in Alabama state court. GE Energy removed the case to federal court under 9 U. S. C. §205. It then moved to dismiss and compel arbitration, relying on the arbitration clauses in the F. L. Industries and ThyssenKrupp contracts. The District Court granted the motion, concluding that both Outokumpu and GE Energy were parties to the agreement. The Eleventh Circuit reversed. It concluded that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention or Convention) allows enforcement of an arbitration agreement only by the parties that actually signed the agreement and that GE Energy was a nonsignatory. It also held that allowing GE Energy to rely on state-law equitable estoppel doctrines to enforce the arbitration agreement would conflict with the Convention's signatory requirement.

*Held*: The New York Convention does not conflict with domestic equitable estoppel doctrines that permit the enforcement of arbitration agreements by nonsignatories. Pp. 3–12.

   (a) Chapter 1 of the Federal Arbitration Act (FAA) does not "alter

background principles of state contract law regarding the scope of
agreements (including the question of who is bound by them)." *Arthur
Andersen LLP* v. *Carlisle*, 556 U. S. 624, 630. The "'traditional princi-
ples' of state law" that apply under Chapter 1 include doctrines, like
equitable estoppel, authorizing contract enforcement by a nonsigna-
tory. *Id.*, at 631–632.

The New York Convention is a multilateral treaty addressing inter-
national arbitration. One Article of the Convention addresses arbitra-
tion agreements—Article II—and one provision of Article II addresses
the enforcement of those agreements—Article II(3). Article II(3) pro-
vides that courts of a contracting state "shall . . . refer the parties to
arbitration" when the parties to an action entered into a written agree-
ment to arbitrate and one of the parties requests such a referral.

Chapter 2 of the FAA grants federal courts jurisdiction over actions
governed by the Convention. As relevant here, Chapter 2 provides that
"Chapter 1 applies to actions and proceedings brought under this chap-
ter to the extent that [Chapter 1] is not in conflict with this chapter or
the Convention." 9 U. S. C. §208. Pp. 3–6.

(b) The application of familiar tools of treaty interpretation estab-
lishes that the state-law equitable estoppel doctrines permitted under
Chapter 1 do not "conflict with . . . the Convention." §208. Pp. 6–11.

(1) The text of the New York Convention does not address whether
nonsignatories may enforce arbitration agreements under domestic
doctrines such as equitable estoppel. The Convention is simply silent
on the issue of nonsignatory enforcement. This silence is dispositive
because nothing in the Convention's text could be read to conflict with
the application of domestic equitable estoppel doctrines. Article II(3)—
the only provision in the Convention addressing the enforcement of ar-
bitration agreements—contains no exclusionary language; it does not
state that arbitration agreements shall be enforced *only* in the identi-
fied circumstances. Given that the Convention was drafted against
the backdrop of domestic law, it would be unnatural to read Article
II(3) to displace domestic doctrines in the absence of such language.
This interpretation is especially appropriate because Article II contem-
plates using domestic doctrines to fill gaps in the Convention. Pp. 6–
7.

(2) This interpretation is confirmed by the Convention's negotia-
tion and drafting history as well as "'the postratification understand-
ing' of signatory nations," *Medellín* v. *Texas*, 552 U. S. 491, 507.
Cherry-picked generalizations from the negotiating and drafting
history cannot be used to create a rule that finds no support in the
treaty's text. Here, to the extent that the Convention's drafting history
sheds any light on the treaty's meaning, it shows only that the drafters
sought to impose baseline requirements on contracting states so that

Syllabus

signatories would "not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements." *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506, 520, n. 15.

The postratification understanding of other contracting states—as evidenced by the "[d]ecisions of the courts of other Convention signatories," *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng*, 525 U. S. 155, 175, and the "postratification conduct" of contracting state governments, *Zicherman* v. *Korean Air Lines Co.*, 516 U. S. 217, 227—may also serve as an aid to this Court's interpretation. Here, numerous sources indicate that the New York Convention does not prohibit the application of domestic law addressing the enforcement of arbitration agreements. These sources, however, are from decades after the finalization of the New York Convention's text in 1958. This diminishes their value as evidence of the original understanding of the treaty's meaning.

Finally, because the Court's textual analysis and the Executive's interpretation of the Convention align here, there is no need to determine whether the Executive's understanding is entitled to "weight" or "deference." Cf. *Edelman* v. *Lynchburg College*, 535 U. S. 106, 114–115, n. 8. Pp. 7–11.

(c) The Court of Appeals may address on remand whether GE Energy can enforce the arbitration clauses under equitable estoppel principles and which body of law governs that determination. Pp. 11–12.

902 F. 3d 1316, reversed and remanded.

THOMAS, J., delivered the opinion for a unanimous Court. SOTOMAYOR, J., filed a concurring opinion.

1

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 18–1048

## GE ENERGY POWER CONVERSION FRANCE SAS, CORP., FKA CONVERTEAM SAS, PETITIONER *v.* OUTOKUMPU STAINLESS USA, LLC, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 1, 2020]

JUSTICE THOMAS delivered the opinion of the Court.

The question in this case is whether the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U. S. T. 2517, T. I. A. S. No. 6997, conflicts with domestic equitable estoppel doctrines that permit the enforcement of arbitration agreements by nonsignatories. We hold that it does not.

I

In 2007, ThyssenKrupp Stainless USA, LLC, entered into three contracts with F. L. Industries, Inc., for the construction of cold rolling mills at ThyssenKrupp's steel manufacturing plant in Alabama. Each of the contracts contained an identical arbitration clause. The clause provided that "[a]ll disputes arising between both parties in connection with or in the performances of the Contract . . . shall be submitted to arbitration for settlement." App. 171.

After executing these agreements, F. L. Industries, Inc., entered into a subcontractor agreement with petitioner GE Energy Power Conversion France SAS, Corp. (GE Energy), then known as Converteam SAS. Under that agreement,

GE Energy agreed to design, manufacture, and supply motors for the cold rolling mills.  Between 2011 and 2012, GE Energy delivered nine motors to the Alabama plant for installation.  Soon thereafter, respondent Outokumpu Stainless USA, LLC, acquired ownership of the plant from ThyssenKrupp.

According to Outokumpu, GE Energy's motors failed by the summer of 2015, resulting in substantial damages.  In 2016, Outokumpu and its insurers filed suit against GE Energy in Alabama state court.  GE Energy removed the case to federal court under 9 U. S. C. §205, which authorizes the removal of an action from state to federal court if the action "relates to an arbitration agreement . . . falling under the Convention [on the Recognition and Enforcement of Foreign Arbitral Awards]."  GE Energy then moved to dismiss and compel arbitration, relying on the arbitration clauses in the contracts between F. L. Industries, Inc., and ThyssenKrupp.

The District Court granted GE Energy's motion to dismiss and compel arbitration with Outokumpu and Sompo Japan Insurance Company of America.  *Outokumpu Stainless USA LLC* v. *Converteam SAS*, 2017 WL 401951 (SD Ala., Jan. 30, 2017).[1]  The court held that GE Energy qualified as a party under the arbitration clauses because the contracts defined the terms "Seller" and "Parties" to include subcontractors.  *Id.*, at \*4.  Because the court concluded that both Outokumpu and GE Energy were parties to the agreements, it declined to address GE Energy's argument that the agreement was enforceable under equitable estoppel. *Id.*, at \*1, n. 1.

The Eleventh Circuit reversed the District Court's order compelling arbitration.  *Outokumpu Stainless USA, LLC* v.

_____

[1] The District Court later granted GE Energy's motion to compel arbitration with additional insurers. *Outokumpu Stainless USA LLC* v. *Converteam SAS*, 2017 WL 480716 (SD Ala., Feb. 3, 2017).

*Converteam SAS*, 902 F. 3d 1316 (2018). The court inter-
preted the Convention on the Recognition and Enforcement
of Foreign Arbitral Awards (New York Convention or Con-
vention) to include a "requirement that the parties *actually
sign* an agreement to arbitrate their disputes in order to
compel arbitration." *Id.*, at 1326 (emphasis in original).
The court concluded that this requirement was not satisfied
because "GE Energy is undeniably not a signatory to the
Contracts." *Ibid.* It then held that GE Energy could not
rely on state-law equitable estoppel doctrines to enforce the
arbitration agreement as a nonsignatory because, in the
court's view, equitable estoppel conflicts with the Conven-
tion's signatory requirement. *Id.*, at 1326–1327.

   Given a conflict between the Courts of Appeals on this
question,[2] we granted certiorari. 588 U. S. \_\_\_ (2019).

## II

### A

   Chapter 1 of the Federal Arbitration Act (FAA) permits
courts to apply state-law doctrines related to the enforce-
ment of arbitration agreements. Section 2 of that chapter
provides that an arbitration agreement in writing "shall be
. . . enforceable, save upon such grounds as exist at law or
in equity for the revocation of any contract." 9 U. S. C. §2.
As we have explained, this provision requires federal courts
to "place [arbitration] agreements '"upon the same footing
as other contracts."'" *Volt Information Sciences, Inc.* v.
*Board of Trustees of Leland Stanford Junior Univ.*, 489
U. S. 468, 474 (1989) (quoting *Scherk* v. *Alberto-Culver Co.*,
417 U. S. 506, 511 (1974)). But it does not "alter back-
ground principles of state contract law regarding the scope
of agreements (including the question of who is bound by

---

   [2] Compare 902 F. 3d 1316, 1326 (CA11 2018), and *Yang* v. *Majestic
Blue Fisheries, LLC*, 876 F. 3d 996, 1001–1002 (CA9 2017), with *Aggarao*
v. *MOL Ship Mgmt. Co.*, 675 F. 3d 355, 375 (CA4 2012), and *Sourcing
Unlimited, Inc.* v. *Asimco Int'l, Inc.*, 526 F. 3d 38, 48 (CA1 2008).

them).”  *Arthur Andersen LLP* v. *Carlisle*, 556 U. S. 624,
630 (2009).

The “traditional principles of state law” that apply under
Chapter 1 include doctrines that authorize the enforcement
of a contract by a nonsignatory.  *Id.*, at 631 (internal quota-
tion marks omitted).  For example, we have recognized that
arbitration agreements may be enforced by nonsignatories
through “‘assumption, piercing the corporate veil, alter ego,
incorporation by reference, third-party beneficiary theories,
waiver and estoppel.’”  *Ibid.* (quoting 21 R. Lord, Williston
on Contracts §57:19, p. 183 (4th ed. 2001)).

This case implicates domestic equitable estoppel doc-
trines.  Generally, in the arbitration context, “equitable es-
toppel allows a nonsignatory to a written agreement con-
taining an arbitration clause to compel arbitration where a
signatory to the written agreement must rely on the terms
of that agreement in asserting its claims against the non-
signatory.”  *Id.*, at 200 (2017).  In *Arthur Andersen*, we rec-
ognized that Chapter 1 of the FAA permits a nonsignatory
to rely on state-law equitable estoppel doctrines to enforce
an arbitration agreement.  556 U. S., at 631–632.

B

The New York Convention is a multilateral treaty that
addresses international arbitration.    21 U. S. T. 2517,
T. I. A. S. No. 6997.  It focuses almost entirely on arbitral
awards.  Article I(1) describes the Convention as applying
only to “the recognition and enforcement of arbitral
awards.”  *Id.,* at 2519.  Articles III, IV, and V contain recog-
nition and enforcement obligations related to arbitral
awards for contracting states and for parties seeking the
enforcement of arbitral awards.  *Id.,* at 2519–2520.  Article
VI addresses when an award can be set aside or suspended.
*Id.,* at 2520.  And Article VII(1) states that the “Convention
shall not . . . deprive any interested party of any right he

may have to avail himself of an arbitral award in the manner and to the extent allowed by the law or the treaties of the country where such award is sought to be relied upon." *Id.,* at 2520–2521.

Only one article of the Convention addresses arbitration agreements—Article II. That article contains only three provisions, each one sentence long. Article II(1) requires "[e]ach Contracting State [to] recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration." *Id.,* at 2519. Article II(2) provides that "[t]he term 'agreement in writing' shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams." *Ibid.* Finally, Article II(3) states that "[t]he court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." *Ibid.*

C

In 1970, the United States acceded to the New York Convention, and Congress enacted implementing legislation in Chapter 2 of the FAA. See 84 Stat. 692, 9 U. S. C. §§201–208. Chapter 2 grants federal courts jurisdiction over actions governed by the Convention, §203; establishes venue for such actions, §204; authorizes removal from state court, §205; and empowers courts to compel arbitration, §206. Chapter 2 also states that "Chapter 1 applies to actions and proceedings brought under this chapter to the extent that

[Chapter 1] is not in conflict with this chapter or the Convention." §208.

## III

We must determine whether the equitable estoppel doctrines permitted under Chapter 1 of the FAA, see *supra,* at 3–4, "conflict with . . . the Convention." §208. Applying familiar tools of treaty interpretation, we conclude that they do not conflict.

## A

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín* v. *Texas*, 552 U. S. 491, 506 (2008). The text of the New York Convention does not address whether nonsignatories may enforce arbitration agreements under domestic doctrines such as equitable estoppel. The Convention is simply silent on the issue of nonsignatory enforcement, and in general, "a matter not covered is to be treated as not covered"—a principle "so obvious that it seems absurd to recite it," A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 93 (2012).

This silence is dispositive here because nothing in the text of the Convention could be read to otherwise prohibit the application of domestic equitable estoppel doctrines. Only one Article of the Convention addresses arbitration agreements—Article II—and only one provision of Article II addresses the enforcement of those agreements—Article II(3). The text of Article II(3) states that courts of a contracting state "shall . . . refer the parties to arbitration" when the parties to an action entered into a written agreement to arbitrate and one of the parties requests referral to arbitration. The provision, however, does not restrict contracting states from applying domestic law to refer parties to arbitration in other circumstances. That is, Article II(3) provides that arbitration agreements must be enforced in

certain circumstances, but it does not prevent the application of domestic laws that are more generous in enforcing arbitration agreements. Article II(3) contains no exclusionary language; it does not state that arbitration agreements shall be enforced *only* in the identified circumstances. Given that the Convention was drafted against the backdrop of domestic law, it would be unnatural to read Article II(3) to displace domestic doctrines in the absence of exclusionary language. Cf. *Marx* v. *General Revenue Corp.*, 568 U. S. 371, 380–384 (2013).

This interpretation is especially appropriate in the context of Article II. Far from displacing domestic law, the provisions of Article II contemplate the use of domestic doctrines to fill gaps in the Convention. For example, Article II(1) refers to disputes "capable of settlement by arbitration," but it does not identify what disputes are arbitrable, leaving that matter to domestic law. *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 639, n. 21 (1985). Similarly, Article II(3) states that it does not apply to agreements that are "null and void, inoperative or incapable of being performed," but it fails to define those terms. Again, the Convention requires courts to rely on domestic law to fill the gaps; it does not set out a comprehensive regime that displaces domestic law.

In sum, the only provision of the Convention that addresses the enforcement of arbitration agreements is Article II(3). We do not read the nonexclusive language of that provision to set a ceiling that tacitly precludes the use of domestic law to enforce arbitration agreements. Thus, nothing in the text of the Convention "conflict[s] with" the application of domestic equitable estoppel doctrines permitted under Chapter 1 of the FAA. 9 U. S. C. §208.

## B

"Because a treaty ratified by the United States is 'an

agreement among sovereign powers,' we have also consid-
ered as 'aids to its interpretation' the negotiation and draft-
ing history of the treaty as well as 'the postratification un-
derstanding' of signatory nations." *Medellín*, 552 U. S., at
507 (quoting *Zicherman* v. *Korean Air Lines Co.*, 516 U. S.
217, 226 (1996)). These aids confirm our interpretation of
the Convention's text.

1

Our precedents have looked to the "negotiating and draft-
ing history" of a treaty as an aid in determining the shared
understanding of the treaty. *Id.*, at 226. Invoking this in-
terpretive aid, Outokumpu argues that the Convention's
drafting history establishes a "rule of consent" that "dis-
place[s] varying local laws." Brief for Respondents 27. We
are unpersuaded. For one, nothing in the text of the Con-
vention imposes a "rule of consent" that displaces domestic
law—let alone a rule that allows some domestic-law doc-
trines and not others, as Outokumpu proposes. The only
time the Convention uses the word "consent" is in Article
X(3), which addresses ratification and accession proce-
dures. Moreover, the statements relied on by Outokumpu
do not address the specific question whether the Conven-
tion prohibits the application of domestic law that would
allow nonsignatories to compel arbitration. Cherry-picked
"generalization[s]" from the negotiating and drafting his-
tory cannot be used to create a rule that finds no support in
the treaty's text. *Zicherman*, 516 U. S., at 227.

To the extent the drafting history sheds any light on the
meaning of the Convention, it shows only that the drafters
sought to impose baseline requirements on contracting
states. As this Court has recognized, "[i]n their discussion
of [Article II], the delegates to the Convention voiced fre-
quent concern that courts of signatory countries . . . should
not be permitted to decline enforcement of such agreements
on the basis of parochial views of their desirability or in a

manner that would diminish the mutually binding nature of the agreements." *Scherk*, 417 U. S., at 520, n. 15 (citing G. Haight, Convention on the Recognition and Enforcement of Foreign Arbitral Awards: Summary Analysis of Record of United Nations Conference, May/June 1958, pp. 24–28 (1958)). Nothing in the drafting history suggests that the Convention sought to prevent contracting states from applying domestic law that permits nonsignatories to enforce arbitration agreements in additional circumstances.

2

"[T]he postratification understanding" of other contracting states may also serve as an aid to our interpretation of a treaty's meaning. *Medellín*, 552 U. S., at 507 (internal quotation marks omitted). To discern this understanding, we have looked to the "[d]ecisions of the courts of other Convention signatories," *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng*, 525 U. S. 155, 175 (1999), as well as the "postratification conduct" of the governments of contracting states, *Zicherman*, 516 U. S., at 227.

Here, the weight of authority from contracting states indicates that the New York Convention does not prohibit the application of domestic law addressing the enforcement of arbitration agreements. The courts of numerous contracting states permit enforcement of arbitration agreements by entities who did not sign an agreement. See 1 G. Born, International Commercial Arbitration §10.02, pp. 1418–1484 (2d ed. 2014) (compiling cases). The United States identifies at least one contracting state with domestic legislation illustrating a similar understanding. See Brief for United States as *Amicus Curiae* 28 (discussing Peru's national legislation). And GE Energy points to a recommendation issued by the United Nations Commission on International Trade Law that, although not directly addressing Article II(3), adopts a nonexclusive interpretation of Article II(1)

and (2).  Report of the United Nations Commission on In-
ternational Trade Law on the Work of Its Thirty-Ninth Ses-
sion, Recommendation Regarding the Interpretation of Ar-
ticle II, Paragraph 2, and Article VII, Paragraph 1, of the
Convention on the Recognition and Enforcement of Foreign
Arbitral Awards ¶¶1, 2, U. N. Doc. A/61/17, annex II (July
7, 2006) (UN recommendation).

  These sources, while generally pointing in one direction,
are not without their faults.  The court decisions, domestic
legislation, and UN recommendation relied on by the par-
ties occurred decades after the finalization of the New York
Convention's text in 1958.  This diminishes the value of
these sources as evidence of the original shared under-
standing of the treaty's meaning.  Moreover, unlike the ac-
tions and decisions of signatory nations, we have not previ-
ously relied on UN recommendations to discern the
meaning of treaties.  See also *Yang* v. *Majestic Blue Fisher-
ies, LLC*, 876 F. 3d 996, 1000–1001 (CA9 2017) (declining to
give weight to the 2006 UN recommendation).  But to the
extent this evidence is given any weight, it confirms our in-
terpretation of the Convention's text.

                                3

  Finally, the parties dispute whether the Executive's in-
terpretation of the New York Convention should affect our
analysis.  The United States claims that we should apply a
"'canon of deference'" and give "'"great weight"'" to an in-
terpretation set forth by the Executive in an *amicus* brief
submitted to the D. C. Circuit in 2014.  Brief for United
States as *Amicus Curiae* 30 (quoting *Abbott* v. *Abbott*, 560
U. S. 1, 15 (2010)); see also Brief for United States as *Ami-
cus Curiae* in No. 13–7004 (CADC), pp. 7, 9.  GE Energy
echoes this request.  Outokumpu, on the other hand, argues
that the Executive's noncontemporaneous interpretation
sheds no light on the meaning of the treaty, asserting that
the Executive expressed the "opposite . . . view at the time

of the Convention's adoption." Brief for Respondents 33. Outokumpu asserts that this Court has repeatedly rejected executive interpretations that contradict the treaty's text or the political branches' previous understanding of a treaty. *Id.*, at 34–35 (citing, *e.g., Chan* v. *Korean Air Lines, Ltd.*, 490 U. S. 122, 136 (1989) (Brennan, J., concurring in judgment); *Perkins* v. *Elg*, 307 U. S. 325, 328, 337–349 (1939)).

We have never provided a full explanation of the basis for our practice of giving weight to the Executive's interpretation of a treaty. Nor have we delineated the limitations of this practice, if any. But we need not resolve these issues today. Our textual analysis aligns with the Executive's interpretation so there is no need to determine whether the Executive's understanding is entitled to "weight" or "deference." Cf. *Edelman* v. *Lynchburg College*, 535 U. S. 106, 114–115, n. 8 (2002) ("[T]here is no need to resolve deference issues when there is no need for deference").

IV

The Court of Appeals did not analyze whether Article II(3) of the New York Convention conflicts with equitable estoppel. Instead, the court held that Article II(1) and (2) include a "requirement that the parties *actually sign* an agreement to arbitrate their disputes in order to compel arbitration." 902 F. 3d, at 1326. But those provisions address the recognition of arbitration agreements, not who is bound by a recognized agreement. Article II(1) simply requires contracting states to "recognize an agreement in writing," and Article II(2) defines the term "agreement in writing." Here, the three agreements at issue were both written and signed.[3] Only Article II(3) speaks to who may request referral under those agreements, and it does not prohibit the application of domestic law. See *supra,* at 6–7.

_____

[3] We do not address whether Article II(2) requires a signed agreement.

Because the Court of Appeals concluded that the Convention prohibits enforcement by nonsignatories, the court did not determine whether GE Energy could enforce the arbitration clauses under principles of equitable estoppel or which body of law governs that determination. Those questions can be addressed on remand. We hold only that the New York Convention does not conflict with the enforcement of arbitration agreements by nonsignatories under domestic-law equitable estoppel doctrines.

*        *        *

For the foregoing reasons, we reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–1048

_____

## GE ENERGY POWER CONVERSION FRANCE SAS, CORP., FKA CONVERTEAM SAS, PETITIONER *v.* OUTOKUMPU STAINLESS USA, LLC, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[June 1, 2020]

JUSTICE SOTOMAYOR, concurring.

I agree with the Court that the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U. S. T. 2517, T. I. A. S. No. 6997 (New York Convention), does not categorically prohibit the application of domestic doctrines, such as equitable estoppel, that may permit nonsignatories to enforce arbitration agreements. I note, however, that the application of such domestic doctrines is subject to an important limitation: Any applicable domestic doctrines must be rooted in the principle of consent to arbitrate.

This limitation is part and parcel of the Federal Arbitration Act (FAA) itself. It is a "basic precept," *Stolt-Nielsen S. A.* v. *AnimalFeeds Int'l Corp.*, 559 U. S. 662, 681 (2010), that "[a]rbitration under the [FAA] is a matter of consent, not coercion," *Volt Information Sciences, Inc.* v. *Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468, 479 (1989); see also, *e.g.*, *Lamps Plus, Inc.* v. *Varela*, 587 U. S. ___, ___ (2019) (slip op., at 7) ("Consent is essential under the FAA"); *Granite Rock Co.* v. *Teamsters*, 561 U. S. 287, 299 (2010) ("[T]he first principle that underscores all of our arbitration decisions" is that "[a]rbitration is strictly 'a matter of consent'"). "We have emphasized th[is] 'foundational FAA principle' many times," *Lamps Plus*, 587

U. S., at ___ (slip op., at 7) (quoting *Stolt-Nielsen*, 559 U. S.,
at 684) (citing cases), and even the parties find common
ground on the point, see Tr. of Oral Arg. 7, 49; Brief for Re-
spondents 2.

Because this consent principle governs the FAA on the
whole, it constrains any domestic doctrines under Chapter
1 of the FAA that might "appl[y]" to Convention proceedings
(to the extent they do not "conflict with" the Convention). 9
U. S. C. §208; cf. *ante*, at 5–6. Parties seeking to enforce
arbitration agreements under Article II of the Convention
thus may not rely on domestic nonsignatory doctrines that
fail to reflect consent to arbitrate.

While the FAA's consent principle itself is crystalline, it
is admittedly difficult to articulate a bright-line test for de-
termining whether a particular domestic nonsignatory doc-
trine reflects consent to arbitrate. That is in no small part
because some domestic nonsignatory doctrines vary from
jurisdiction to jurisdiction. With equitable estoppel, for in-
stance, one formulation of the doctrine may account for a
party's consent to arbitrate while another does not. Cf.
Brief for Respondents 45 (maintaining that courts have
applied at least "three different versions" of GE Energy's
equitable-estoppel theory, including one that allegedly "al-
lows a non-party to force arbitration even of claims wholly
unconnected to the agreement"). Lower courts must there-
fore determine, on a case-by-case basis, whether applying a
domestic nonsignatory doctrine would violate the FAA's in-
herent consent restriction.*

——————

    *In this case, however, I am skeptical that any domestic nonsignatory
doctrines need come into play at all, because Outokumpu appears to have
expressly agreed to arbitrate disputes under the relevant contract with
subcontractors like GE Energy. The contract provided that disputes aris-
ing between the buyer and seller in connection with the contract were
subject to arbitration. App. 171. It also specified that the seller in the
contract "shall be understood" to include "[s]ub-contractors." Id., at 88–
89. And it appended a list of potential subcontractors, one of which was

Article II of the Convention leaves much to the contracting states to resolve on their own, and the FAA imposes few restrictions. Nevertheless, courts applying domestic nonsignatory doctrines to enforce arbitration agreements under the Convention must strictly adhere to "the foundational FAA principle that arbitration is a matter of consent." *Stolt-Nielsen*, 559 U. S., at 684. Because the Court's opinion is consistent with this limitation, I join it in full.

_____

GE Energy's predecessor, Converteam. Id., at 184–185.